STATE, Respondent, v. EAU CLAIRE OIL COMPANY, INC., Appellant.

*June 7—June 30, 1967.*

726

728

729

For the appellant there was a brief by *Wilcox & Wilcox* of Eau Claire, and oral argument by *Francis J. Wilcox*.

For the respondent the cause was argued by *George F. Sieker,* assistant attorney general, with whom on the brief were *Bronson C. La Follette,* attorney general, and *Douglas W. Milsap,* attorney for the Wisconsin department of agriculture.

CURRIE, C. J. Defendant raises the following three issues:

(1) Is sec. 100.30 (2) (j), Stats. 1963, requiring that the advertised price of each element of a combined sale must have at least a six percent markup, constitutional?

(2) Is the last sentence of sec. 100.30 (4), Stats., making evidence of an offer of sale, or sales, at less than cost *prima facie* evidence of intent to induce the purchase of other merchandise, or to unfairly divert trade from a competitor, or otherwise injure a competitor, constitutional?

(3) In determining defendant's cost of the claimed loss-leader items, as such cost is defined in sec. 100.30 (2) (a), Stats., should there be deducted the 12-cent value of the trading stamps the purchaser waives with respect to the concomitant $4 purchase of gasoline?

*Constitutionality of Sec. 100.30 (2) (j), Stats.*

Sec. 100.30 (2) (j), Stats., requires that where an item of merchandise is sold in combination with or on condition of the purchase of another item, and each is separately priced, such separate price is subject to the six percent markup provision of sec. 100.30 (2) (a). Defendant rests its attack on the constitutionality of sub. (2) (j) on two grounds, viz.:

1. The economic reason for upholding the constitutionality of an Unfair Sales Act, such as sec. 100.30, Stats., does not exist with respect to a combination sale where there is an overall profit to the seller.

2. It is arbitrary and unreasonable to prohibit such a combination sale of two items where there is an overall profit to the seller and permit another seller to give free an item in connection with a sale of another item so long as an overall profit also results.

In *State ex rel. Miller v. Manders* [1] this court held:

"This court has previously held that the protection of economic interests of the general public falls within the scope of promotion of the general welfare, and thereby affords a basis for the exercise of the police power. *State v. Ross* (1951), 259 Wis. 379, 384, 48 N. W. (2d) 460, and *State ex rel. Saveland P. H. Corp. v. Wieland* (1955), 269 Wis. 262, 267, 69 N. W. (2d) 217."

*Nebbia v. New York* [2] established the principle that a state legislature has the constitutional power to regulate prices for a purpose which promotes the general welfare.

One of the earliest cases, and the leading case upholding the state's power to enact an unfair sales act, is *Wholesale Tobacco Dealers v. National Candy & Tobacco Co.* [3] In that case the California supreme court upheld the

[1] (1957), 2 Wis. (2d) 365, 371, 86 N. W. (2d) 469.

[2] (1934), 291 U. S. 502, 54 Sup. Ct. 505, 78 L. Ed. 940.

[3] (1938), 11 Cal. (2d) 634, 82 Pac. (2d) 3. See also Note 34 Virginia Law Review (1948), 201, 203, footnote 14.

constitutionality of the California Unfair Practices Act of 1913, as amended, stating:

"It has now become firmly established that the police power of the state extends not only to the preservation of the public health, safety and morals, but also extends to the preservation and promotion of the public welfare. In recent years the state, in promoting and advancing the general welfare of its citizens, has frequently and properly used this power to promote the general prosperity of the state by the *regulation of economic conditions.* . . . (Emphasis supplied.) [4]
"That . . . the fostering of free, open and fair competition and the *prohibition of unfair trade practices* is in the public welfare is obvious, and requires no further citation of authority." (Emphasis supplied.) [5]

The court went on to explain the principles of *Nebbia v. New York, supra,* and found the Unfair Practices Act to be a sufficient compliance therewith, even as a price-fixing act. The court expressed the view that nevertheless the act was not of a "price-fixing" nature, on the theory that the prohibition against sales below cost merely fixed a floor beneath which prices may not be set, the seller's discretion in fixing his price remaining otherwise untrammeled.

Since the *Wholesale Tobacco Dealers* decision, *supra,* courts including Wisconsin have generally held such statutes to be within the power of the legislature.[6] Two relatively recent United States supreme court decisions, *Safeway Stores v. Oklahoma Grocers* [7] and *United States*

---

[4] (1938), 11 Cal. (2d) 634, 643.

[5] Id. at page 646.

[6] *State v. Ross* (1951), 259 Wis. 379, 48 N. W. (2d) 460; *State v. Walgreen Drug Co.* (1941), 57 Ariz. 308, 113 Pac. (2d) 650; *Moore v. Northern Kentucky Independent Food Dealers Asso.* (1941), 286 Ky. 24, 149 S. W. (2d) 755; *Fournier v. Troianello* (1955), 332 Mass. 636, 127 N. W. (2d) 167; *McElhone v. Geror* (1940), 207 Minn. 580, 292 N. W. 414; *State v. Langley* (1938), 53 Wyo. 332, 84 Pac. (2d) 767.

[7] (1959), 360 U. S. 334, 79 Sup. Ct. 1196, 3 L. Ed. (2d) 1280.

*v. National Dairy Corp.*[8] reflect general acceptance of the ideas upon which state acts are based.

Defendant reads *State v. Ross* [9] as holding that the legislative justification for sec. 100.30, Stats., is based upon the theory that a sale at a loss is the thing which is against public policy. From this premise it argues that its combination sales at issue here are not at a loss because it realizes an overall profit. Therefore, it is argued there is no economic justification for the requirement of sub. (2) (j) of sec. 100.30, that each separately priced item must reflect the required minimum markup of six percent.

Some courts have held that the statutory prohibition against selling below cost bears no true relation to the protection of fair competition in distribution and that it imposes unreasonable and unnecessary restrictions thereon.[10] Law review commentators have also criticized the wisdom and economic soundness generally of statutes prohibiting loss-leader sales.[11]

However, the United States supreme court recently refused to pass judgment on the correctness of economic policy underlying provisions of a state Unfair Sales Act.

[8] (1963), 372 U. S. 29, 83 Sup. Ct. 594, 9 L. Ed. (2d) 561. This case was decided under the "unreasonably low price" clause of sec. 3 of the Robinson-Patman Act.

[9] Footnote 6, *supra.*

[10] *Commonwealth v. Hodin* (1938), 34 Pa. D. & C. 270, quoting from *State v. Packard-Bamberger & Co., Inc.* (1938), 16 N. J. Misc. 479, 2 Atl. (2d) 599, affirmed (1939), 123 N. J. Law 180, 8 Atl. (2d) 291. See also *Balzer v. Caler* (Cal. App. 1937), 74 Pac. (2d) 839, affirmed (1938), 11 Cal. (2d) 663, 82 Pac. (2d) 19, and 1 Callmann, Unfair Competition and Trade-Marks (2d ed.), p. 534, sec. 27.3 (c).

[11] Adelman, Integration and the Antitrust Laws, 63 Harvard Law Review (1949), 27, 45; Clark, Statutory Restrictions on Selling Below Cost, 11 Vanderbilt Law Review (1957), 105, 110, 111; LaRue, Pitfalls for Price Competitors, 15 Western Reserve Law Review (1963), 35, 64; Note, Sales Below Cost Prohibitions: Private Price Fixing Under State Law, 57 Yale Law Journal (1948), 391.

In *Safeway Stores v. Oklahoma Grocers* [12] it was contended that Oklahoma's Unfair Sales Act violated the Fourteenth amendment because it permitted a retail seller who was selling at, or close to, cost to give trading stamps while it prohibited another retailer to grant a cash price reduction equivalent to the value of the trading stamps, if such reduction resulted in a selling price below cost. It was argued that for the state to differentiate between the two situations was a constitutionally impermissible discrimination. The court refused to find the act unconstitutional stating:

"Certainly this court will not interpose its own economic view or guesses when the State has made its choice." [13]

The preamble set forth in sub. (1) of sec. 100.30, Stats., states *inter alia,* "The practice of selling certain items of merchandise below cost in order to attract patronage is generally a form of deceptive advertising and an unfair method of competition in commerce." By enacting sub. (2) (j), it must be assumed the legislature deemed sales below cost of an item as a loss leader equally objectionable to the stated preamble objective whether the seller depends upon the loss-leader item to voluntarily induce the purchase of other merchandise, the profit on which more than covers the loss on the loss leader, or whether the seller makes sure this is the case by requiring a tie-in sale of other merchandise. This is a legislative policy determination with which the courts should not interfere. As this court said in *Gottlieb v. Milwaukee:* [14]

---

[12] Footnote 7, *supra.*

[13] Id. at page 341.

[14] (1967), 33 Wis. (2d) 408, 415, 416, 147 N. W. (2d) 635. See also *State v. Dried Milk Products Co-operative* (1962), 16 Wis. (2d) 357, 363, 114 N. W. (2d) 412; *White House Milk Co. v. Reynolds* (1960), 12 Wis. (2d) 143, 106 N. W. (2d) 441; *State v. Ross* (1951), 259 Wis. 379, 48 N. W. (2d) 460.

"We as a court are not concerned with the merits of the legislation under attack. We are not concerned with the wisdom of what the legislature has done. We are judicially concerned only when the statute clearly contravenes some constitutional provision. *Chicago & N. W. R. Co. v. La Follette* (1965), 27 Wis. (2d) 505, 521, 135 N. W. (2d) 269."

We turn now to defendant's contention that it is arbitrary and unreasonable to require each of the items of a combination sale which are separately priced to be sold at a price which is not below cost as defined by sub. (2) (a) of sec. 100.30, Stats., while permitting merchandise to be given away in connection with the sale of other merchandise so long as the selling price of the latter is sufficient to cover its cost plus the cost of the gift.[15]

Again it is a legislative and not a judicial determination whether a combination sale in which an overall profit is realized by the seller, but in which one of the separately priced items is sold at a loss, is more objectionable from the standpoint of harm to competing sellers than the combination sale and gift at an overall profit. Callmann offers this explanation for such difference in treatment in Unfair Sales Acts:

"It would be the rare case in which a seller attempts to drive a competitor out of business by means of gifts and premiums. One who offers a gift or premium is more

[15] The words "offered as a gift, or given with the sale" which were in sub. (2) (j) of sec. 100.30, Stats., at the time of this court's decision in *State ex rel. Heath v. Tankar Gas, Inc.* (1947), 250 Wis. 218, 26 N. W. (2d) 647, were removed therefrom by subsequent amendments. One of these was ch. 44, sec. 2, which repealed and recreated sub. (2) (j) and substituted "furnished" for "offered as a gift." It was the 1961 amendment which added the provision: "and if any of the items included therein are separately-priced, such separate price shall be subject to the requirements of this section."

interested in increasing his business than in injuring his competitor. These methods of attracting trade are not sufficiently offensive to be regarded as a weapon in the economic fight." [16]

It is our considered judgment that sub. (2) (j) of sec. 100.30, Stats., is not unconstitutional as applied to defendant's combination sales so as to prohibit any separately priced item being advertised or sold at a price below cost as defined by sub. (2) (a).

*Constitutionality of the Legislative Presumption of Intent Contained in Sec. 100.30 (4), Stats.*

Defendant attacks the constitutionality of the last sentence of sub. (4) of sec. 100.30, Stats., which provides:

"(4) . . . Evidence of any advertisement, offer to sell, or sale of any item of merchandise by any retailer or wholesaler at less than cost as defined in this section shall be prima facie evidence of intent to induce the purchase of other merchandise, or to unfairly divert trade from a competitor, or to otherwise injure a competitor."

Originally this sentence of the act read:

"Proof of any such advertising, offer to sell or sale by any retailer . . . in contravention of the policy of this section shall be prima facie evidence of a violation hereof."

In referring to the original wording the court in *State v. Twentieth Century Market* [17] declared "it is not within the province of the legislature to declare an individual guilty of a crime." Thereafter the legislature amended the sentence to read as it now reads. The last sentence of sub. (4), sec. 100.30, Stats., as it now reads, was before

---

[16] 1 Callmann, Unfair Competition & Trade-Marks (2d ed.), p. 568, sec. 29.

[17] (1940), 236 Wis. 215, 220, 294 N. W. 873.

this court in *State v. Ross* [18] wherein its constitutionality was upheld, the court stating:

> "The statute was amended and it is now clear that the plaintiff may establish *prima facie* evidence of intent by proof of advertising or sale of items below cost. The burden of going forward with the evidence then shifts to the defendant.
> "We cannot agree with appellant that this presumption in favor of the plaintiff is unreasonable or that it amounts to a conclusion of guilt." [19]

The United States supreme court in *United States v. Gainey* [20] recently held that a statutory presumption grounded on evidentiary facts in a criminal statute is constitutionally permissible if there is a rational connection between such evidentiary facts and the fact presumed. There the court upheld a statutory provision making defendant's unexplained presence at a still sufficient evidence of his possession, custody or control of an unregistered still.

In *McIntire v. Borofsky* [21] a section of the New Hampshire Unfair Sales Act, which section provided that advertisements or sales at less than cost "are *prima facie* evidence of a violation" of the act, was attacked as being unconstitutional. The court held the section valid, stating:

> ". . . there is a rational connection between the fact to be proved and the fact presumed. . . ." [22]

---

[18] Footnote 6, *supra.*

[19] Id. at page 385.

[20] (1965), 380 U. S. 63, 85 Sup. Ct. 754, 13 L. Ed. (2d) 658. This case reversed *Barrett v. United States* (5th Cir. 1963), 322 Fed. (2d) 292, cited in *Browne v. State* (1964), 24 Wis. (2d) 491, 511d, 129 N. W. (2d) 175, 131 N. W. (2d) 169.

[21] (1948), 95 N. H. 174, 59 Atl. (2d) 471.

[22] Id. at page 177. See also *People v. Pay Less Drug Store* (1944), 25 Cal. (2d) 108, 153 Pac. (2d) 9.

We hold there is a rational connection between the facts presumed in the last sentence of sub. (4) of sec. 100.30, Stats., viz., "intent to induce the purchase of other merchandise, or to unfairly divert trade from a competitor, or to otherwise injure a competitor" and the evidence of the selling by defendant of the mixed nuts, toilet tissue, and work gloves below cost. Therefore, it necessarily follows that the statutory presumption is constitutional as so applied.

### Trading Stamps as an Item of Cost.

When one of defendant's patrons elects to purchase $4 worth of gasoline without a concomitant purchase of a loss-leader item such as mixed nuts, toilet tissue or work gloves, he is given trading stamps by defendant having a value of 12 cents. On the other hand, if the customer elects to purchase one of the loss-leader items, he receives no trading stamps in connection with the $4 gasoline purchase, thereby saving defendant an out-of-pocket expenditure of 12 cents. Defendant contends the 12-cent saving should be deducted from the cost of the loss-leader item of the combination sale. The effect of such deduction would be to reduce the cost of any of the three loss-leader items to a figure that would result in each being sold at a profit. The computation of cost for the purposes of determining whether an item is sold at a loss is strictly prescribed by sub. (2) (a) of sec. 100.30, Stats. The only statutory language of sub. (2) (a) which conceivably could cover such a deduction is "less all trade discounts except customary discounts for cash."

The same contention was advanced by defendant in the circuit court and rejected. The court's memorandum decision stated:

"[This] Court is unable to recognize such transposition as a trade discount. It is well-established that a trade discount is a credit which the vendor, usually a whole-

saler, gives to a vendee, who is usually a retailer, the most common form of which occurs in the adjustment of catalog prices. Such transposition as the defendant urges is pure fiction."

"Transposition" is an apt characterization of defendant's argument with respect to the 12-cent value of trading stamps because the stamps, if given, are in connection with the sale of the gasoline. This 12-cent saving is not a "trade discount" in computing the cost of a loss-leader item sold by defendant in a combination sale with $4 worth of gasoline.

In 26A C. J. S., Discount, p. 974, trade discount is defined as:

". . . the difference between the seller's list price and the price at which he actually sells goods to the trade; . . ."

Webster's Third New International Dictionary defines trade discount as:

"a percentage deduction from the list price of goods allowed by a manufacturer or wholesaler to customers engaged in trade."

Similarly, The Random House Dictionary defines trade discount as:

"a deduction from the list price of goods, granted by a manufacturer or wholesaler to a retailer."

The foregoing definitions, particularly the latter two, make it abundantly clear that a trade discount is given by a wholesaler or manufacturer to the retailer, not by the retailer to a customer or patron, as defendant would have this court hold. Therefore, defendant is not entitled to a deduction equal to the value of the trading stamps to be applied against the cost of a loss-leader item of a combination sale with gasoline.

*By the Court.*—Judgment affirmed.

HANSEN, J., took no part.