James J. GROSS and Mall Mart, Inc., both d/b/a Citgo Quick Mart, Plaintiffs-Respondents,

v.

WOODMAN'S FOOD MARKET, INC., d/b/a Woodman's Food Market Gas Station, a Wisconsin corporation, Defendant-Appellant,†

ABC CORPORATION, Defendant.

Court of Appeals

*No. 01–1746. Oral argument July 25, 2002.—Decided November 14, 2002.*

2002 WI App 295

(Also reported in 655 N.W.2d 718.)

† Petition to review denied 4-22-03.

On behalf of the defendant-appellant, the cause was orally argued by and submitted on the briefs of *Thomas L. Basting, Sr., of Brennan Steil, Basting & MacDougall, S.C.*, Janesville.

On behalf of the plaintiffs-respondents, the cause was orally argued by and submitted on the brief of *Michael L. Stoker* of *Johns & Flaherty, S.C.*, La Crosse.

On behalf of Petroleum Marketers Association of Wisconsin/Wisconsin Association of Convenience Stores, Inc., the cause was orally argued by and submitted on the brief of *Thomas L. Skalmoski* of *Weiss Berzowski Brady LLP*, Milwaukee.

Before Vergeront, P.J., Roggensack and Lundsten, JJ.

¶ 1. VERGERONT, P.J. Woodman's Food Market, Inc. appeals the circuit court's summary judgment concluding that it violated the Wisconsin Unfair Sales Act, Wis. Stat. § 100.30 (1999–2000),[1] by selling motor vehicle fuel below cost as defined in the statute on 295 days, and ordering Woodman's to pay $590,000 to James Gross and Mall Mart, Inc. Woodman's operates a grocery store and adjacent gas station in Onalaska, Wisconsin, and Gross operates Citgo Quick Mart, a convenience store owned by Mall Mart, Inc. that sells motor vehicle fuel in Holmen, Wisconsin.

¶ 2. We conclude that, with respect to 293 days, there are no genuine issues of material fact, and Gross and Mall Mart, Inc. are entitled to judgment as a matter of law that on those dates Woodman's violated the Act by selling motor vehicle fuel below cost as defined in the statute (statutory cost) with the effect of injuring a competitor. In reaching this conclusion, we decide that the circuit court properly exercised its discretion in allowing relation back of the second amended complaint, and we make the following rulings regarding the Act: (1) whether Woodman's is a wholesaler or retailer under the Act is irrelevant in this case because either way the proper terminal for computing the "average posted terminal price" is the terminal closest to Woodman's gas station in Onalaska; (2) Woodman's is a competitor of Gross and Mall Mart, Inc. with respect to diesel fuel because both Woodman's and Citgo Quick Mart offer that fuel for sale to non-Woodman vehicles in

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

the same geographic area; (3) WIS. STAT. § 100.30(3) prohibits sales below statutory cost with either the proscribed intent or the proscribed effect; (4) it is undisputed that Woodman's did not come within the exception of § 100.30(6)(a)7 for meeting a competitor's price; (5) the Act is not unconstitutionally vague as applied to Woodman's; and (6) the Act does not offend due process by prohibiting certain conduct and its effect regardless of the seller's intent.

¶ 3. Woodman's also appealed the circuit court's ruling allowing Gross and Mall Mart, Inc. to withdraw their demand for a jury trial, which Woodman's had also demanded, and ordering that trial would be to the court. However, Gross and Mall Mart, Inc. have conceded that under *Village Food & Liquor Mart v. H&S Petroleum, Inc.*, 2002 WI 92, 254 Wis.2d 478, 647 N.W.2d 177, Woodman's has a constitutional right to a jury trial on any factual issues.

¶ 4. Accordingly, we affirm the summary judgment for 293 days of violations, reverse it as to two days, and remand to the circuit court with instructions to reduce the monetary award on summary judgment to $586,000. We also reverse the court's order that trial will be to the court and remand for a jury trial on all remaining factual issues.

## STATUTORY BACKGROUND

¶ 5. Wisconsin's Unfair Sales Act prohibits "[a]ny sale of any item of merchandise either by a retailer, wholesaler, wholesaler of motor vehicle fuel or refiner, at less than cost as defined in this section with the intent or effect of inducing the purchase of other merchandise or of unfairly diverting trade from a competitor . . . ." WIS. STAT. § 100.30(3). In proving a

194

violation, "evidence of any sale of any item of merchandise . . . at less than cost as defined in this section shall be prima facie evidence of intent or effect to induce the purchase of other merchandise, or to unfairly divert trade from a competitor, or to otherwise injure a competitor." *Id.*[2]

¶ 6. "Cost" for retail sales of motor vehicle fuel, as relevant to this case, is defined as the *higher* of two computations, one using the seller's invoice or replacement cost as a base (invoice/replacement formula) and the other using the average posted terminal (APT) price

---

[2] Wisconsin Stat. § 100.30(3) provides in full:

(3) Illegality of loss leaders. Any sale of any item of merchandise either by a retailer, wholesaler, wholesaler of motor vehicle fuel or refiner, at less than cost as defined in this section with the intent or effect of inducing the purchase of other merchandise or of unfairly diverting trade from a competitor, impairs and prevents fair competition, injures public welfare and is unfair competition and contrary to public policy and the policy of this section. Such sales are prohibited. Evidence of any sale of any item of merchandise by any retailer, wholesaler, wholesaler of motor vehicle fuel or refiner at less than cost as defined in this section shall be prima facie evidence of intent or effect to induce the purchase of other merchandise, or to unfairly divert trade from a competitor, or to otherwise injure a competitor.

The policy underlying the Act is expressly stated in Wis. Stat. § 100.30(1):

Unfair sales act. (1) Policy. The practice of selling certain items of merchandise below cost in order to attract patronage is generally a form of deceptive advertising and an unfair method of competition in commerce. Such practice causes commercial dislocations, misleads the consumer, works back against the farmer, directly burdens and obstructs commerce, and diverts business from dealers who maintain a fair price policy. Bankruptcies among merchants who fail because of the competition of those who use such methods result in unemployment, disruption of leases, and nonpayment of taxes and loans, and contribute to an inevitable train of undesirable consequences, including economic depression.

■■■

■■■

as a base (APT formula). WIS. STAT. § 100.30(2)(am)1m.b and c.[3] Motor vehicle fuel is pur-

[3] WISCONSIN STAT. § 100.30(2)(am)1m.b and c provide:

1m. With respect to the sale of motor vehicle fuel, "cost to retailer" means the following:

. . . .

b. In the case of the retail sale of motor vehicle fuel by a wholesaler of motor vehicle fuel, who is not a refiner, at a retail station owned or operated either directly or indirectly by the wholesaler of motor vehicle fuel, the invoice cost of the motor vehicle fuel to the wholesaler of motor vehicle fuel within 10 days prior to the date of sale, or the replacement cost of the motor vehicle fuel, whichever is lower, less all trade discounts except customary discounts for cash, plus any excise, sales or use taxes imposed on the motor vehicle fuel or on its sale, and any cost incurred for transportation and any other charges not otherwise included in the invoice cost or replacement cost of the motor vehicle fuel, plus a markup of 9.18% of that amount to cover a proportionate part of the cost of doing business; or the average posted terminal price at the terminal located closest to the retail station plus a markup of 9.18% of the average posted terminal price to cover a proportionate part of the cost of doing business; whichever is greater.

c. In the case of the retail sale of motor vehicle fuel by a person other than a refiner or a wholesaler of motor vehicle fuel at a retail station, the invoice cost of the motor vehicle fuel to the retailer within 10 days prior to the date of sale, or the replacement cost of the motor vehicle fuel, whichever is lower, less all trade discounts except customary discounts for cash, plus any excise, sales or use taxes imposed on the motor vehicle fuel or on its sale and any cost incurred for transportation and any other charges not otherwise included in the invoice cost or the replacement cost of the motor vehicle fuel, plus a markup of 6% of that amount to cover a proportionate part of the cost of doing business; or the average posted terminal price at the terminal located closest to the retailer plus a markup of 9.18% of the average posted terminal price to cover a proportionate part of the cost of doing business; whichever is greater.

chased at terminals.[4] The APT price is defined by statute and, in general terms, is the terminal price as published by a petroleum reporting service, plus taxes, transportation, and other charges not already included.[5] The APT formula then adds a markup of 9.18% to cover the cost of doing business. Section 100.30(2)(am)1m.b and c.[6]

---

[4] "Terminal" is defined as the "storage and distribution facility that is supplied by a pipeline or marine vessels, from which facility motor vehicle fuel may be removed at a rack and from which facility at least 3 refiners or wholesalers of motor vehicle fuel sell motor vehicle fuel." WIS. STAT. § 100.30(2)(j).

[5] WISCONSIN STAT. § 100.30(2)(a) provides:

(2)(a)"Average posted terminal price" means the average posted rack price, as published by a petroleum price reporting service, at which motor vehicle fuel is offered for sale at the close of business on the determination date by all refiners and wholesalers of motor vehicle fuel at a terminal plus any excise, sales or use taxes imposed on the motor vehicle fuel or on its sale, any cost incurred for transportation and any other charges that are not otherwise included in the average posted rack price. In this paragraph, "average" means the arithmetic mean.

WISCONSIN STAT. § 100.30(2)(cg) defines "determination date" as:

(cg) 1. Except as provided in subd. 2., "determination date" is the day preceding the day of the sale at retail of motor vehicle fuel.

[6] Under the invoice/replacement formula, one starts with the invoice cost within ten days of the sale or replacement cost, whichever is lower, deducts specified discounts, and adds taxes, transportation, other charges not already included, and a markup to cover the cost of doing business—6% for a retailer and 9.18% for a wholesaler. WIS. STAT. § 100.30(2)(am)1m.b and c.

¶ 7. The requirements of the Act do not apply to sales in certain specified situations, and the exception relevant in this case is for meeting a competitor's price. WISCONSIN STAT. § 100.30(6)7 provides that the provisions of the Act do not apply when:

> 7. The price of merchandise is made in good faith to meet an existing price of a competitor and is based on evidence in the possession of the retailer, wholesaler, wholesaler of motor vehicle fuel or refiner in the form of an advertisement, proof of sale or receipted purchase, price survey or other business record maintained by the retailer, wholesaler, wholesaler of motor vehicle fuel or refiner in the ordinary course of trade or the usual conduct of business.

Those invoking this exception are required to notify the Department of Agriculture, Trade and Consumer Protection (DATCP) "of the lower price before the close of business on the day on which the price was lowered in the form and manner required by the department." Section 100.30(7)(a). If that is done, the DATCP may not proceed against that person or entity, and there is immunity from liability for a private cause of action. Section 100.30(7)(c). Failure to comply with the notification requirement creates a rebuttable presumption that the price was not lowered to meet a competitor's price. Section 100.30(7)(b).

## RELATION BACK OF AMENDED COMPLAINT

¶ 8. Gross filed this action on November 16, 1998, as the individual owner of Citgo Quick Mart. The complaint alleged that Woodman's had sold gasoline and diesel fuel at a price below statutory cost and had

198

injured him as a result.[7] However, although Gross had initially owned the Citgo Quick Mart as a sole proprietor, he created Mall Mart, Inc. in August of 1998 and transferred the ownership of the store to the corporation on October 1, 1998. Gross filed a motion for leave to amend on December 14, 1999, seeking to add Mall Mart, Inc. as the real party in interest for all violations of the Act occurring after October 1, 1998, and to have the amendment relate back to the date on which the original complaint was filed. The affidavit of Gross's counsel averred that he first learned of the incorporation of Mall Mart, Inc. at Gross's deposition on October 20, 1999; that Gross advised him that he (Gross) had told a former associate of counsel's firm about the corporation, but neither had brought it to counsel's attention, apparently believing it was not relevant to the case. Woodman's consented to the amendment, but objected to its relation back.

¶ 9. The circuit court granted the motion of Gross and Mall Mart, Inc. to allow the amendment to relate back to the filing of the original complaint. The court concluded that the amendment related to the same transactions and operative facts as those in the original complaint, and the failure to name Mall Mart, Inc. in that complaint had not prejudiced Woodman's ability to defend against the claims.

¶ 10. The applicable statute, Wis. Stat. § 802.09(3), provides:

(3) Relation back of amendments. If the claim asserted in the amended pleading arose out of the transaction, occurrence, or event set forth or attempted to be set forth in the original pleading, the amendment

[7] The complaint alleged other claims that Gross is not pursuing.

relates back to the date of the filing of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against such party, the party to be brought in by amendment has received such notice of the institution of the action that he or she will not be prejudiced in maintaining a defense on the merits, and knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against such party.

¶ 11. This statute applies to an amendment to add a plaintiff. *Korkow v. Gen. Cas. Co. of Wisconsin*, 117 Wis. 2d 187, 196, 344 N.W.2d 108 (1984); *Estate of Kitzman v. Kitzman*, 163 Wis. 2d 399, 402, 471 N.W.2d 293 (Ct. App. 1991). If the claim asserted in the amendment arises out of the same transaction, occurrence, or event set forth in the original pleading, relation back is presumptively appropriate; however, the circuit court has the discretion to deny leave to amend when it would result in prejudice to the other party. *Korkow*, 117 Wis 2d at 196–97. We affirm discretionary decisions if the circuit court applied the correct law to the relevant facts of record in a reasoned manner. *Grothe v. Valley Coatings, Inc.*, 2000 WI App 240, ¶ 12, 239 Wis. 2d 406, 620 N.W.2d 463.

¶ 12. Woodman's contends the circuit court erroneously exercised its discretion in allowing relation back because Gross knew that Mall Mart, Inc. was the owner of the store, as did an associate of the law firm, and thus there was no mistake about the identity of the proper party. According to Woodman's, the second sentence of Wis. Stat. § 802.09(3) does not permit an amendment adding a plaintiff to relate back unless there was a mistake concerning the proper party.

200

¶ 13. We do not agree with Woodman's reading of the statute. The plain language of the second sentence refers only to a party against whom a claim is asserted. The cases applying this sentence are therefore not applicable in deciding under what circumstances a court may properly allow an amendment adding a plaintiff to relate back. *See, e.g., Groom v. Professionals Ins. Co.*, 179 Wis. 2d 241, 251–52, 507 N.W.2d 121 (Ct. App. 1993).

¶ 14. Woodman's counsel argued at oral argument that Woodman's was prejudiced because if the motion did not relate back, Woodman's would not be liable for violations occurring after October 1, 1998.[8] However, the proper prejudice inquiry, as the circuit court recognized, is: was Woodman's prejudiced by not knowing from November 16, 1998 to December 14, 1999, that Mall Mart, Inc., rather than Gross, was the owner of Citgo Quick Mart? Woodman's does not explain how this caused it prejudice.

¶ 15. There is no question that the claims that Mall Mart, Inc. is asserting against Woodman's are factually and legally the same claims that Gross asserted against Woodman's in the initial complaint. We conclude the circuit court applied the correct law to the relevant facts and properly exercised its discretion in allowing the amendment adding Mall Mart, Inc. to relate back to the filing of the original complaint.[9]

---

[8] Private causes of action must be brought within 180 days of the violation. Wis. Stat. § 100.30(5m).

[9] From here on, we use "Gross" to refer to both plaintiffs unless the context indicates otherwise.

## SUMMARY JUDGMENT

*Background*

¶ 16. Gross moved for summary judgment, initially claiming that there were 738 occasions on which Woodman's sold motor vehicle fuel below statutory cost without filing a notice with DATCP, and there was no evidence to overcome the presumption of a violation on any of those occasions.

¶ 17. In Gross's first affidavit, he averred the following. Citgo Quick Mart and Woodman's sell the same grades of motor fuel, including diesel, although in October 1999, Woodman's began selling an ethanol blend of unleaded fuel, which he does not sell. Generally speaking, Gross uses the APT formula as the statutory cost because that results in a higher price than the invoice/replacement formula. The terminal nearest to his station and Woodman's Onalaska store is at Eyota, Minnesota (outside Rochester). Gross subscribes to a "OPIS Reporting Service" that sends him the APT price at that terminal for each grade of motor vehicle fuel on each weekday. With his affidavit, Gross submitted a chart which, he averred, showed for each violation occurring between September 13, 1998 and June 3, 2000: (1) the APT price for the motor vehicle fuel at the Eyota terminal based on the OPIS reports he received; (2) the price based on the APT formula for a retailer; (3) the highest price using that formula for the preceding ten days;[10] and (4) Woodman's price based on documentation received in discovery. Gross stated that his transportation costs were between 2 to 2.3 cents per gallon for the time period involved, and Woodman's in

---

[10] The ten-day window relates to the "determination date," which affects the ATP price. *See* WIS. STAT. § 100.30(2)(c)2(cg).

discovery had stated its transportation costs were between 2.5 and 3 cents per gallon. Gross specified the combined tax and transportation cost he used in applying the APT formula for both gasoline and diesel fuel.[11] Gross explained he was not submitting the OPIS reports and other supporting documentation for the chart because it was so voluminous, but he would provide them to the court or opposing counsel upon request.

¶ 18. Gross averred that it is his business practice to do a survey to obtain prices of his competitors to see what the market price is for various grades of motor vehicle fuel. In conducting those surveys, he has observed that Woodman's prices for various grades of motor fuels have at times been below the statutory minimum price, and, "[i]n order to compete with the market that is skewed based on Woodman's reduced price, [he has] been forced to lower [his] price to meet or approach the market rate, thus reducing [his] profit margin."

¶ 19. Gross also submitted depositions that showed that Tom Wysocki manages Woodman's grocery store and gas station in Onalaska and is responsible for the daily setting of motor vehicle fuel prices at that gas station. Wysocki stated that he computes the prices on a daily basis, using the cost for the day faxed to him by Woodman's supplier as a "general guideline," plus taxes and transportation plus 9.18% of that sum. He does not receive information on motor vehicle fuel prices from a price reporting service. He regularly drives around the area to check on the prices at other gas stations, and

---

[11] The figures he used changed during three time periods, which he identified, and were: for gasoline, 48.8 cents, 49.2 cents, and 49.8 cents, and for diesel fuel, 55.1 cents, 55.5 cents, and 56.1 cents.

that includes· Gross's station, and he may adjust the price based on his competitors' prices. Woodman's sets the same price for diesel fuel as for unleaded gasoline; it does not calculate a separate price. Wysocki, prior to December 1, 1999, did not record or retain price survey information in the regular course of Woodman's business. Woodman's has not filed any "meet competition" notice with DATCP.

¶ 20. Woodman's responded to Gross's motion for summary judgment by arguing that Gross's affidavit was deficient because it did not provide the data and calculations to support his assertions on Woodman's price violations, and Gross was not an expert on setting prices under the statute. Woodman's also objected to two attachments to Gross's affidavit—a memorandum to gas station owners from DATCP on the Act which, Gross averred, he received from DATCP, and seminar materials on the Act which, Gross averred, he received from a seminar he attended. Woodman's contended that neither was legally binding and the former was not authenticated and was inadmissible hearsay.[12]

---

[12] Woodman's also objected to certain of Gross's statements as legal conclusions, and the circuit court agreed with Woodman's and did not consider them. For reasons that are not clear to us, Woodman's renews these objections on appeal. We do not discuss them further because the circuit court correctly did not consider Gross's legal conclusions in deciding whether Gross's submissions established a prima facie factual case, and we do not either. *Hooper v. City of Madison*, 79 Wis. 2d 120, 130, 256 N.W.2d 139 (1977) (court is to disregard conclusions of law contained in affidavits on motion for summary judgment). Woodman's challenged other submissions of Gross in the circuit court, which it renews on appeal: the affidavits of Kevin LeRoy, Joseph Veenstra, Paul Dingee, and Michael Stoker (paragraph

¶ 21. In addition, Woodman's contended it was entitled to summary judgment because the undisputed facts showed: Gross had used the wrong formula in that Woodman's was a wholesaler, not a retailer; Woodman's had used the correct statutory cost except as necessary to meet a competitor's price; Gross was not Woodman's competitor with respect to diesel fuel; Woodman's did not intend to divert trade from or injure its competitors, and its pricing did not have an effect on competition; and the Act was unconstitutional. Alternatively, Woodman's argued that since intent was an issue, summary judgment was improper.

¶ 22. Wysocki's affidavit in support of Woodman's motion for summary judgment averred as follows with respect to diesel fuel. Diesel fuel is available at one pump for the purpose of supplying diesel fuel for Woodman's own semi-trucks that haul products to and from Woodman's various grocery stores. Because of the location of this pump, in order for a semi-truck to use it, the semi-truck must drop its trailer at another location. Since this pump is not readily accessible to non-Woodman's semi-trucks, the sales of diesel fuel made to non-Woodman's vehicles are not made to semi-truck drivers, but to drivers of older cars that still use diesel fuel. Woodman's does not have a marketing strategy to attract either non-Woodman's semi-trucks or diesel cars. Woodman's does not advertise its diesel prices through posted signs or in any other way, and to determine the price, a person has to look at the pump. The sales of diesel fuel to the public at this gas station are insignificant compared to the sales of regular, mid-grade, and premium unleaded fuel. Woodman's

17 of his January 2001 affidavit). We do not discuss these objections because these submissions are not necessary to our analysis.

does not have a policy of setting diesel prices below cost or for the purpose of diverting trade from competing gas stations, and Wysocki has never done so. Attached to Wysocki's affidavit were records of the amount of diesel fuel Woodman's sold to non-Woodman's vehicles on the days Gross asserted there were violations.

¶ 23. Wysocki also averred that when he lowered Woodman's prices to match a competitor's price, he made a notation of the competitor's prices on documents entitled "Sparta Co-op Services" (Sparta documents),[13] copies of which were attached to his affidavit. There were also handwritten price calculations on the Sparta documents, which, Wysocki averred, he had made for each day that Gross alleged there was a violation.

¶ 24. In response to Woodman's objections, Gross submitted a supplemental affidavit, along with the OPIS reports and Woodman's discovery responses on which he had relied in preparing the chart. The discovery responses included Woodman's fuel prices and Woodman's transportation costs—2-1/2 to 3 cents a gallon.

¶ 25. Gross averred in his supplemental affidavit that:

> In my experience, when a gas station or stations lower their prices, others follow suit in order to compete . . . . On many occasions, including but not limited to the dates listed on the charts that were previously submitted to the Court as I have lowered the price at the Citgo [Quick] Mart after finding that Woodman's was selling

---

[13] Sparta Co-op Services is Woodman's fuel supplier and is not relevant to this appeal; we identify the documents in this way for ease of reference.

motor vehicle fuel, including diesel, at a price below the statutory minimum. On those dates, I lost revenue.

¶ 26. Woodman's objected to Gross's supplemental affidavit as untimely. The court decided that it had the authority to consider the affidavit and attachments, that it was in the interests of judicial economy to do so, and that it was fair to both parties. With respect to Woodman's other objections to Gross's affidavits, the court decided that the memorandum Gross attached from DATCP was neither legally binding nor hearsay, and was admissible for the purpose of establishing that Gross, as the operator of a gas station, had received it, and, by inference, Woodman's would have received it, too.[14] The court apparently did not separately address Woodman's objection to the seminar materials. The court decided that the charts appended to Gross's first affidavit were admissible even without the underlying documentation under WIS. STAT. § 910.06,[15] and that Gross had in any event provided that documentation. Finally, the court decided that Gross had the requisite knowledge and experience regarding pricing of motor vehicle fuels under the Act to testify concerning the calculation of the price mandated by the Act.

[14] The court added that the later affidavit of Joseph Veenstra contained the certification necessary to authenticate the DATCP documents. However, that certification was of other DATCP records, which are not relevant to our analysis. *See* footnote 12.

[15] WISCONSIN STAT. § 910.06 provides:

> **Summaries.** The contents of voluminous writings, recordings or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The judge may order that they be produced in court.

¶ 27. In response to Woodman's submissions, Gross modified his request for summary judgment to 323 violations. Gross explained that he deducted alleged violations for: (1) diesel fuel on days for which Woodman's records showed it made no sale of diesel fuel, (2) sales other than diesel fuel that occurred after September 1999 when Woodman's asserted it began selling ethanol-based gasoline, and (3) those for which Woodman's service records had notations that might arguably be considered an informal price survey.

¶ 28. The court first decided that Gross's submissions established a prima facie case for a violation of the statute. It next decided that Woodman's submissions (1) did not show that there was an inaccuracy in Gross's calculations except for March 8 through March 14, 2000, which the court excluded; (2) did not show Woodman's had ever filed a notice with DATCP; and (3) except for a few dates which the court eliminated, did not show that Woodman's had documentation even arguably meeting the requirement of Wis. Stat. § 100.30(6)(a)7 for the "meet competition" exception.[16]

¶ 29. The court rejected Woodman's argument that summary judgment was inappropriate because intent was an issue. It concluded Wis. Stat. § 100.30(3) prohibited selling at less than statutory cost with the

---

[16] At the hearing before the circuit court, counsel for Woodman's explained that the calculations on the copies of Sparta documents that Wysocki submitted with his affidavit were added in response to the litigation to explain what Wysocki had done when he set the prices. The court stated that, in deciding whether any of Woodman's business records arguably met the "meets competition exception," it would not consider that set of copies, but only the set of copies Woodman's produced in discovery, which Gross had submitted with his supplemental affidavit.

proscribed intent or with the proscribed effect, and a sale at less than statutory cost was prima facie evidence of that intent or effect. Section 100.30(3). The court decided that, since Woodman's had not presented any evidence that rebutted the statutory presumption arising from sales below statutory cost, Gross was entitled to summary judgment that Woodman's violated the Act on 295 days. The court identified these dates in an addendum to its decision.[17] The court rejected Woodman's arguments that it was a retailer, that it was not a competitor of Gross with respect to diesel fuel, and that the Act was unconstitutional. The court awarded $2,000 for each day of violation pursuant to § 100.30(5m).[18] We granted Woodman's petition for

[17] The court arrived at these dates by eliminating from the chart Gross filed: (1) days on which Woodman's did not sell diesel fuel; (2) days on which Woodman's sold only ethanol-blend fuel; (3) days on which any of Woodman's service records had a notation of another competitor's fuel price; (4) days when there was incomplete data on Gross's chart; (5) March 8 through March 14 where a factual dispute exists over Woodman's motor vehicle fuel price; and (6) Christmas Day, when Woodman's was not open for business.

[18] WISCONSIN STAT. § 100.30(5m) provides:

(5m) PRIVATE CAUSE OF ACTION. Any person who is injured or threatened with injury as a result of a sale or purchase of motor vehicle fuel in violation of sub. (3) may bring an action against the person who violated sub. (3) for temporary or permanent injunctive relief or an action against the person for 3 times the amount of any monetary loss sustained or an amount equal to $2,000, whichever is greater, multiplied by each day of continued violation, together with costs, including accounting fees and reasonable attorney fees, notwithstanding s. 814.04 (1). An action under this subsection may not be brought after 180 days after the date of a violation of sub. (3).

leave to appeal the trial court's order granting summary judgment.[19]

*Standard of Review*

¶ 30. Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). We employ the same methodology as the circuit court, and our review is de novo. *Id.* Where, as here, the complaint states a claim for relief and the answer joins issue, we examine the moving party's affidavits to determine whether that party has made a prima facie case for summary judgment. *Brownelli v. McCaughtry*, 182 Wis. 2d 367, 372, 514 N.W.2d 48, 49 (Ct. App. 1994). If it has, we then look to the opposing party's affidavits to determine whether

---

[19] WISCONSIN STAT. § 808.03(2) provides:

(2) Appeals by permission. A judgment or order not appealable as a matter of right under sub. (1) may be appealed to the court of appeals in advance of a final judgment or order upon leave granted by the court if it determines that an appeal will:

(a) Materially advance the termination of the litigation or clarify further proceedings in the litigation;

(b) Protect the petitioner from substantial or irreparable injury; or

(c) Clarify an issue of general importance in the administration of justice.

The trial court's order granting summary judgment was a nonfinal order because the alleged violations eliminated by Gross and the court for summary judgment remained for trial.

there are any material facts in dispute which entitle the opposing party to a trial. *Id.* at 372–73, 514 N.W.2d at 49–50.

¶ 31. Affidavits in support of or opposition to summary judgment "shall be made on personal knowledge and shall set forth such evidentiary facts as would be admissible in evidence." Wis. Stat. § 802.08(3). On summary judgment, the party relying on evidence need not submit sufficient evidence to conclusively demonstrate the admissibility of the evidence it relied upon in its affidavits. *Dean Medical Center v. Frye,* 149 Wis. 2d 727, 734–35, 439 N.W.2d 633, 636 (Ct. App. 1989). The party producing the evidence need only make a prima facie showing that the evidence would be admissible. *Id.* The burden then shifts to the opposing party to show that the evidence is inadmissible or to show facts which put the evidence at issue. *Id.* at 735, 439 N.W.2d at 636. If the admissibility of the evidence is challenged, the court must then determine whether the evidence would be admissible.

¶ 32. Although we employ the summary judgment methodology de novo, we review the circuit court's decision allowing supplemental affidavits under the deferential standard for discretionary decisions, since that decision is committed to the circuit court's discretion. Wisconsin Stat. § 802.08(3) provides that the "court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." Similarly, the decision whether a submission meets the requirements of § 802.08(3) that "affidavits shall be made on personal knowledge and shall set forth such evidentiary facts as would be

admissible in evidence," may involve evidentiary rulings that are committed to the circuit court's discretion. For example, the question whether a witness qualifies as an expert is generally left to the circuit court's discretion. *State v. Robinson*, 146 Wis. 2d 315, 332, 431 N.W.2d 165 (1988).

*Admissibility and Sufficiency of Gross's Submissions*

¶ 33. Woodman's contends many of Gross's submissions should not have been considered by the court. We examine each objection and conclude that Gross's relevant submissions were admissible under Wis. Stat. § 802.08(3), and further that they establish a prima facie case of entitlement to summary judgment.

¶ 34. We address first Woodman's contention that the circuit court erroneously exercised its discretion in accepting Gross's supplemental affidavit because he was required to submit all the evidence he relied on with his motion and should not have been allowed to "rectify evidentiary flaws" with a supplemental affidavit. As we have already stated, the statute specifically authorizes the court to allow supplemental affidavits. Wis. Stat. § 802.08(3). We are satisfied the court properly exercised its discretion in doing so here. The court observed that the case had been continued several times, both parties had been given the opportunity to fully present their case, and Woodman's had been "at least as active as Gross in requesting or stipulating to continuances." The court also reasoned that considering all the parties' filings would more likely result in a fair resolution and avoid an unnecessary trial. These are proper factors to consider and the court's result is reasonable. Woodman's has pointed to no unfair preju-

dice resulting from the court's consideration of Gross's supplemental affidavit, nor does Woodman's assert that it did not have an opportunity to respond if it chose.

¶ 35. We next address Woodman's objections to the admissibility of the memorandum from DATCP and the seminar materials attached to Gross's first affidavit. We conclude the court properly exercised its discretion in considering these for the purpose of showing that Gross received them. Gross was competent to testify to what he received and to his attendance at a seminar. The court understood that the contents were not legally binding, and it did not consider them for the truth of the matters they asserted; therefore they were not inadmissible hearsay under WIS. STAT. § 908.01(3), nor did they need to be authenticated.

¶ 36. Woodman's also argues that the court erroneously exercised its discretion in concluding that Gross had the knowledge and experience to testify regarding the correct statutory minimum price.[20] Our analysis differs somewhat from the circuit court's because we conclude there are aspects of that testimony that do not require expertise. However, we conclude that, for those aspects that do require expertise, the circuit court reasonably decided that Gross's submission established an adequate foundation and were properly admissible under WIS. STAT. § 802.08(3).

---

[20] WISCONSIN STAT. § 907.02 provides:

> **Testimony by experts**. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

¶ 37. With respect to the factors involved in the APT formula,[21] we conclude that expert testimony is needed to establish the following: (1) the correct tax, (2) that the Eyota terminal is the closest terminal to Citgo Quick Mart and Woodman's in Onalaska that meets the statutory definition, and (3) that the OPIS reporting service supplies the APT price, as defined in the statute, for the Eyota terminal. We conclude that the foundation supplied by Gross's affidavits—that he had been setting motor fuel prices since 1995, had reviewed the statute and regulations, had attended some seminars and trade shows regarding gas pricing, and had received and read communications from DATCP—provides a reasonable basis for concluding that he had the experience and knowledge to testify on these matters. Gross does not need to be an expert to testify to his own transportation costs, because he has personal knowledge of those, Wis. STAT. § 906.02;[22] and

---

[21] The question whether the invoice/replacement formula or the ATP formula is the correct one depends on which results in a higher cost. WIS. STAT. § 100.30(2)(am)1m.b and c. Since Gross's submissions showed that Woodman's prices were below cost based on the ATP formula, it was unnecessary for him to establish, as part of a prima facie case, what the results of application of the invoice formula would be. If the invoice/replacement formula results in a lower cost than the ATP formula, the ATP formula is the statutory minimum; if the invoice/replacement formula results in a higher cost than the ATP formula, that would not reduce the number of sales below the statutory minimum.

[22] WISCONSIN STAT. § 906.02 provides:

**Lack of personal knowledge**. A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist

Woodman's transportation costs were supplied by Woodman's discovery responses. Finally, the calculations required by the APT formula, once the necessary facts are established, are not a matter requiring expert testimony, but are simply a matter of adding and multiplying as directed by the statute.[23]

¶ 38. We also conclude the court properly exercised its discretion in deciding that the chart appended to Gross's first affidavit was admissible. Gross explained in his affidavit the formula and the data he used in arriving at the statutory minimum price and the source of the data he used for Woodman's prices, and he provided the terminal price documentation and the documentation for Woodman's prices with his supplemental affidavit. There was therefore an adequate foundation for the chart. Gross did not need to supply his calculations; those are simply a matter of adding and multiplying, which Woodman's can do if it wishes to verify the accuracy of Gross's arithmetic.

of the testimony of the witness. This rule is subject to the provisions of s. 907.03 relating to opinion testimony by expert witnesses.

[23] Woodman's argues that the general rule is that expert opinion testimony may not be considered on summary judgment, citing *Dean Medical Center v. Frye*, 149 Wis. 2d 727, 733, 439 N.W.2d 633 (Ct. App.1989). However, we concluded in *Dean* that this rule did not apply if the issue is one on which expert testimony must be produced at trial. *Id.* at 734–35. Woodman's itself argues that expert testimony is needed on the correct statutory minimum price; its objection is that Gross does not have the requisite expertise. Therefore, *Dean* does not support its position.

¶ 39. Finally, we reject Woodman's contention that Gross's averments regarding the injury to his business are inadmissible because they are too conclusory. Gross's testimony in his supplemental affidavit that he lowered his price "on many occasions, including but not limited to the dates listed on the charts that were previously submitted to the Court . . . after finding that Woodman's was selling motor vehicle fuel, including diesel, at a price below the statutory minimum" and that "on those dates, [he] lost revenue" is admissible because it contains evidentiary facts of which Gross has personal knowledge. True, they are general statements of fact, but nothing in Wis. Stat. § 802.08(3) requires more specificity. Woodman's had the opportunity to require Gross through discovery to produce more specific evidence of lost profits and to use that to controvert Gross's averments if warranted.

¶ 40. We conclude that Gross's submissions establish a prima facie case for summary judgment. They show that Woodman's sold motor vehicle fuel at below the statutory minimum price on 295 days without filing a notice under Wis. Stat. § 100.30(7)(a). This constitutes prima facie evidence of a violation of the statute under § 100.30(3) and creates a rebuttable presumption under para. (7)(b) that Woodman's did not lower prices to meet the competition.

*Retailer vs. Wholesaler*

¶ 41. Woodman's contends that it is entitled to summary judgment because the Madison terminal is the correct one to use for the APT price, not Eyota, and if Madison is used, Woodman's submissions show that

216

its prices were always below statutory cost. Madison is the correct terminal, Woodman's argues, because Woodman's is a retailer under the statute and therefore must use the terminal that is "closest to the retailer," WIS. STAT. § 100.30(2)(am)1m.c, not that "closest to the retail station," which applies to wholesalers. Section 100.30(2)(am)1m.b.[24] Woodman's argues that the terminal "closest to the retailer" is properly interpreted as the terminal closest to its corporate headquarters, which is in Janesville, making Madison the closest terminal.

---

[24] WISCONSIN STAT. § 100.30(2) defines "retailer" and "wholesaler":

(2)(e) "Retailer" includes every person engaged in the business of making sales at retail within this state, but, in the case of a person engaged in the business of selling both at retail and at wholesale, such term shall be applied only to the retail portion of such business.

. . . .

(m) "Wholesaler of motor vehicle fuel" includes any of the following:

1. A person who stores motor vehicle fuel and sells it through 5 or more retail outlets that the person owns or operates.

2. A person who acquires motor vehicle fuel from a refiner or as a sale at wholesale and stores it in a bulk storage facility other than a retail station for further sale and distribution.

3. A person engaged in the business of making sales at wholesale of motor vehicle fuel within this state.

4. A person engaged in the business of selling diesel fuel if that person's sales of diesel fuel accounted for at least 60% of that person's total sales of motor vehicle fuel in the previous year or, if that person did not engage in the business of selling diesel fuel in the previous year, if that person reasonably anticipates that sales of diesel fuel will account for at least 60% of that person's total sales of motor vehicle fuel in the current year.

217

¶ 42. This issue presents a question of statutory construction, a question of law, which we review de novo. The purpose of statutory construction is to discern the intent of the legislature, and to this end we first consider the language of the statute. *State v. Setagord*, 211 Wis. 2d 397, 406, 565 N.W.2d 506 (1997). If the language clearly and unambiguously sets forth the intent of the legislature, we apply that language to the facts at hand. *Id.* Statutory language is clear and unambiguous when it has only one reasonable meaning, and, conversely, it is ambiguous when it is capable of being reasonably understood in two or more different ways. *Id.* We avoid constructions of statutory language that are unreasonable. *Maxey v. Redevelopment Authority*, 120 Wis. 2d 13, 20, 353 N.W.2d 812 (Ct. App. 1984).

¶ 43. We conclude that Woodman's proposed construction of "closest to the retailer" is not reasonable, because the location of the corporate headquarters of a company has no relationship to the location of the retail sale. Under Woodman's construction, for example, if a corporate retailer has headquarters in a distant state, the terminal price in that distant state determines the motor vehicle fuel price in Wisconsin, thereby affecting the market in Wisconsin. The only reasonable construction, we conclude, is that "terminal closest to the retailer" means the terminal closest to the location where the retail sale occurs. It is therefore not necessary to decide whether Woodman's is a retailer or a wholesaler under the statute in order to apply the APT formula, because in both cases the proper terminal is the one closest to Woodman's Onalaska store, the loca-

tion of the retail sale. Based on the submissions, there is no dispute that this terminal is located at Eyota, Minnesota.

*Woodman's and Gross as Competitors*

¶ 44. Woodman's contends that WIS. STAT. § 100.30(3) requires that the seller must be competing for customers for the particular grade or type of motor vehicle fuel that was sold below statutory cost. According to Woodman's, it is not a competitor in the diesel fuel market because its submissions show that its sales of diesel fuel to the public are insignificant in number and it does not try to attract customers for diesel fuel. Since Gross's submissions do not dispute this evidence, Woodman's continues, Woodman's did not as a matter of law violate the statute with respect to any sale of diesel fuel.[25]

¶ 45. We assume without deciding that Woodman's premise is correct—that WIS. STAT. § 100.30(3) requires that the seller and the alleged injured party be competitors with respect to the particular grade or type of motor vehicle fuel that was sold below statutory cost. However, we do not agree that the statute imposes the limited definition of "competitor" that Woodman's proposes. A wholesaler or retailer of motor vehicle fuel violates the statute if it sells fuel below statutory cost with the specified intent or effect. Evidence of the effort the seller makes to market a motor vehicle fuel and the actual number of sales it makes may be relevant to the

[25] Woodman's does not argue that it is not Gross's competitor with respect to the sale of regular, mid-grade, and premium unleaded gasoline.

seller's intent and may also be relevant to the effect of the sales it does make. However, we see nothing in the statutory language to indicate that the statute does not apply at all unless the seller intends to have or does have a particular market share. We conclude that Gross is Woodman's competitor with respect to diesel fuel within the meaning of WIS. STAT. § 100.30(3) because, based on the undisputed facts, they both sell diesel fuel to non-Woodman's vehicles in the same geographic area.

*Calculation of APT Formula*

■■

¶ 46. Woodman's contends that a discrepancy in transportation costs creates a factual dispute over the correct calculations applying the APT formula. According to Woodman's, Gross used 2 cents per gallon for unleaded gasoline and 2.3 cents per gallon for diesel fuel in his calculations instead of using Woodman's actual transportation costs. However, Woodman's responses in discovery show that its transportation costs are between 2.5 cents and 3 cents per gallon. Use of these costs would have resulted in a higher statutory minimum price, which would not be to Woodman's advantage and would not reduce the number of sales below the statutory minimum price. Therefore, the dispute over whether Gross should have used Woodman's actual transportation costs is not material.

¶ 47. We conclude, as did the circuit court, that the undisputed facts are that Woodman's sold fuel on 295 days at below the statutory minimum price.

*Evidence of Intent or Effect*

¶ 48. Woodman's contends that it submitted un-controverted testimony that it did not intend to violate the statute, and therefore it has overcome any prima facie evidence of a violation of the statute and is entitled to summary judgment. It appears that Woodman's may be assuming that "intent" and "effect" as used in Wis. Stat. § 100.30(3) are the same. However, we agree with the circuit court that each term plainly has a different meaning. The common meaning of "intent" is "purpose," and the common meaning of "effect" is "result."[26] The plain meaning of § 100.30(3), therefore, is that it pro-hibits a sale at less than statutory cost if Woodman's had either an intent that is proscribed by the statute or the sale had an effect proscribed by the statute.

¶ 49. We observe that the proscribed intent and effect in the first sentence of Wis. Stat. § 100.30(3) do not include the phrase, "or to otherwise injure a com-petitor," whereas the sentence describing prima facie evidence of intent or effect states that a sale at less than statutory cost is "prima facie evidence of intent or effect to induce the purchase of other merchandise, or to unfairly divert trade from a competitor, or to otherwise injure a competitor." Section 100.30(3). Neither party

---

[26] American Heritage Dictionary (3rd ed. 1993) pp. 707, 437. We are to interpret language in statutes according to its common and ordinary usage, unless another meaning is indi-cated, and we may consult a standard dictionary for the common meaning of a word. *Swatek v. County of Dane*, 192 Wis. 2d 47, 61, 531 N.W.2d 45, 50 (1995). Use of a dictionary to establish the meaning of a word does not mean that it is ambiguous. *State v. Curiel*, 227 Wis. 2d 389, 404–05, 597 N.W.2d 697 (1999).

comments on this apparent discrepancy. We conclude the only reasonable construction of subsec. (3), read as a whole, is that it prohibits a sale at less than statutory cost if there is either the intent or effect of injuring a competitor in ways other than unfairly diverting trade from a competitor. It makes no sense to provide that a sale below statutory cost is prima facie evidence of a category of intent or effect that is not a violation of the statute.

¶ 50. This reading is confirmed by the history of the statute. From 1941 until 1987, WIS. STAT. § 100.30(4) defined the elements of the violation, as well as the penalty, and included the phrase, "or to otherwise injure a competitor."[27] When that subsection was revised by 1987 Wis. Act 175 to replace fines and imprisonment with a civil forfeiture, the language defining a violation was removed and replaced by "For any violation of sub. 3," which was then identical to the present subsec. (3). We are satisfied that the legislature did not intend to alter the elements of a violation, but simply overlooked the fact that the first sentence of subsec. (3) did not contain the phrase, "or to otherwise injure a competitor."[28]

---

[27] WISCONSIN STAT. § 100.30 was originally enacted by Laws of 1939, ch. 56. With the changes made by Laws of 1941, ch. 75, § 4 defined a violation only in terms of proscribed intent; "or effect" was added to § 4 by Laws of 1965, ch. 629.

[28] Although we may not use legislative history to create an ambiguity in a statute, we may use it to reinforce a conclusion that the statute is indeed unambiguous. *Novak v. Madison Motel Assoc.*, 188 Wis. 2d 407, 416, 525 N.W.2d 123 (Ct. App. 1994).

¶ 51. Because the statute is violated if there is either the proscribed intent or the proscribed effect, we need address Woodman's evidence only with respect to effect.[29] The evidence of Woodman's sales below statutory cost on 295 days is, under WIS. STAT. § 100.30(3), prima facie evidence that those sales had the effect of unfairly diverting trade from Gross or otherwise injuring him. Gross averred that he lost revenue because he lowered his prices after finding that Woodman's was selling motor vehicle fuel, including diesel, at a price below statutory cost. Woodman's evidence that it sold little diesel fuel to non-Woodman's vehicles, that it did not advertise diesel fuel, and that one could not see the prices from the road creates a reasonable inference that its diesel fuel prices did not divert diesel customers from Gross. However, this evidence does not dispute the evidence that Gross was injured by losing profits from setting his prices, including diesel, lower to compete with Woodman's prices. Woodman's has pointed to no other evidence that would arguably show that Gross did

---

[29] Woodman's refers us to two California cases—*Tri-Q, Inc. v. Sta-Hi Corp.*, 404 P.2d 486, 488, 491 (1965), and *Dooley's Hardware Mart v. Food Giant Markets, Inc.*, 21 Cal. App. 3d 513 (1971). However these cases are not helpful because the language of the California statute differs significantly from that of WIS. STAT. § 100.30(3) in that it prohibits a below cost sale if "for the purpose of injuring competitors or destroying competition" and "proof of [such a sale], together with proof of the injurious effect of such acts, is presumptive evidence of the purpose or intent to injure competitors or destroy competition." CAL. BUS. & PROF. CODE §§ 17043, 17071, cited in *Tri-Q*, 404 P.2d at 488, 491, and *Dooley's*, 21 Cal. App. at 516 n.2, 517 n.4. We also note that these cases do not address the evidence of intent that is sufficient to entitle a defendant to summary judgment, but, rather, address findings made after a trial to the court.

not lose profits as a result of setting his prices lower to meet Woodman's. Accordingly, we conclude that there is no dispute that the sales below statutory cost on 295 days did have the effect of injuring Gross.

*Exception for Meeting a Competitor's Price*

¶ 52. Woodman's acknowledges that it did not submit any notices to DATCP, and there is therefore a rebuttable presumption that it did not lower prices to meet a competitor's price, WIS. STAT. § 100.30(7)(b). However, Woodman's contends that its submissions overcome this presumption and establish as a matter of law that it has fulfilled the requirements of the exception in § 100.30(6)(a)7. Woodman's asserts that Wysocki's deposition, affidavit, and attachments show that when he lowered prices, it was a good-faith effort to meet the existing price of a competitor. Woodman's contends that the notations on the Sparta documents are "other business records maintained by [it] in the usual course of business." Section 100.30(6)(a)7. Woodman's focuses its argument on sales of fuel other than diesel because of its position that Woodman's is not a competitor of Gross with respect to diesel fuel and therefore those sales are not subject to the Act. However, since we have rejected that position, we consider all fuels in deciding whether the Sparta documents satisfy § 100.30(6)(a)7 for any of the 295 days in the circuit court's addendum.

¶ 53. Woodman's appears to rely in its argument on notations and calculations Wysocki made on the Sparta documents after copies were provided to Gross in discovery. However, we agree with the circuit court that in analyzing whether Woodman's has evidence that

224

meets the requirement of WIS. STAT. § 100.30(6)(a)7, the proper set of Sparta documents to consider are those Woodman's produced in discovery and that Gross submitted with his supplemental affidavit. *See* footnote 16. Notations of competitor's prices and calculations or comments based thereon that Wysocki later made on those records to explain, for purposes of this litigation, how and why he had set those prices are not "records maintained in the usual conduct of business," which § 100.30(6)(a)7 requires. *See State v. Williams*, 2002 WI 58, ¶¶ 42 and 49, 253 Wis. 2d 99, 121, 123, 644 N.W.2d 919 (generally records prepared in anticipation of litigation are not business records under WIS. STAT. § 908.03(6), the business records exception to the hearsay rule).

¶ 54. We have examined all Sparta documents attached to Gross's supplemental affidavit. When there is a notation of a competitor's price, we assume for purposes of this appeal that notation arguably meets the requirements of WIS. STAT. § 100.30(6)(a)7 and therefore there is no violation of the statute if Woodman's sets its price the same or lower for that grade of fuel on that date.[30] Our review leads us to conclude that

---

[30] For example, the Sparta document for January 22, 1999, contains this handwritten notation at the bottom: "94.9 Matching Conoco West Salem." Gross's chart and the circuit court's addendum show Woodman's price on that date was 94.9 cents for regular gasoline and 99.9 for mid-grade gasoline, and that the statutory minimum price was, respectively, 96.10 and 101.690. We do not count the regular gasoline as a violation because we assume, for purposes of this appeal, that the notation is a business record that satisfies WIS. STAT. § 100.30(6)(a)7 and shows that Woodman's lowered the price of regular gasoline below the statutory minimum price to match

on all but two of the dates in the circuit court's addendum—March 9, 1999 and March 12, 1999—there is no notation for at least one grade of fuel that is included on Gross's chart on that date.[31] Accordingly, we conclude there are 293 dates on which it is undisputed that there was a sale of at least one of Woodman's products at a price below the statutory minimum price and for which there is no evidence that the exception in § 100.30(6)(a)7 applies.

Conoco's price. However, this notation does not even arguably explain why the price for mid-grade gasoline was set below the statutory minimum price. Therefore, Woodman's price of mid-grade gasoline is not based on evidence in Woodman's possession as required by subd. (6)(a)7. We set out this example because Woodman's appears to be of the view that if the Sparta documents show a competitor's price for any grade of fuel on a particular date, sales of all grades on that date come within the exception in subd.(6)(a)7. However, we conclude the only reasonable interpretation of subd. (6)(a)7, as applied to this case, is that the exception must be established for each grade of fuel Woodman's sells.

[31] For March 9, 1999, Gross's chart lists only diesel fuel, with Woodman's price at 99.9, which is below the statutory minimum for that day and for the ten-day window as shown on the chart. However, the notation on the Sparta document for that day says "95.9 to 99.9 matching Kwik Trip," which arguably refers to diesel fuel, since we have no record of another fuel that was matched on that date. The same is true for March 12: Gross's chart lists only diesel fuel, with Woodman's price at 99.9, below the statutory minimum for that day and the ten-day window; the Sparta document notation shows competitor's prices from 95.9 to 105.9.

*Constitutional Challenges*

¶ 55. Woodman's challenges the constitutionality of the Act on two grounds: it is so vague that it constitutes a denial of due process, and it violates due process because a seller may be penalized even if the seller lacks the intent to violate the Act. The constitutionality of a statute presents a question of law, which we review de novo. *State v. Zarnke,* 224 Wis. 2d 116, 124, 589 N.W.2d 370 (1999). In considering both challenges, we bear in mind that, like all statutes, the Act "enjoys a strong presumption of constitutionality," and "every presumption must be indulged to sustain" the Act. *Jackson v. Benson,* 218 Wis. 2d 835, 853, 578 N.W.2d 602 (1998).

¶ 56. Woodman's contends the Act is vague because the meaning of the following terms are not clear: "wholesaler," "retailer," and "competitor" in Wis. Stat. § 100.30(3); "any cost incurred for transportation" and "other charges that are not otherwise included in the average posted rack price" in § 100.30(2)(a); and "direct competitor" in § 100.30(2)(cj), which term is used in the "meets competition" exception in subd. (6)(a)7. The parties assert different standards for judging unconstitutional vagueness, with Gross drawing from civil cases and Woodman's asserting that, because it is subject to treble damages, the statute is penal in nature and therefore a stricter standard should apply.[32]

---

[32] Woodman's relies on *Open Pantry Food Marts of Southeastern Wisconsin v. Falcone,* 92 Wis. 2d 807, 810–11, 286 N.W.2d 149 (Ct. App 1979), in which we held that the treble damages provision of Wis. Stat. § 133.01, the Wisconsin Antitrust Law, made it punitive as well as remedial, and therefore

*See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) ("The degree of vagueness that the Constitution tolerates—as well as the relative enforcement of fair notice and enforcement—depends in part on the nature of the enactment" and also depends on whether there are civil or criminal penalties.). Gross relies on *Moedern v. McGinnis*, 70 Wis. 2d 1056, 1073–74, 236 N.W.2d 240 (1975), which states that the standard for a civil statute is whether it is "so vague and uncertain that it is impossible to execute it or to ascertain the legislative intent with reasonable certainty." With respect to a criminal statute, we have stated it is unconstitutionally vague if it either fails to afford proper notice of the conduct it seeks to proscribe or fails to provide an objective standard for enforcement, *State v Hahn*, 221 Wis. 2d 670, 677, 586 N.W.2d 5 (Ct. App. 1998). To give proper notice, a criminal statute must warn people who wish to obey the law that their conduct comes near the proscribed area. *Id.*[33]

---

the statute of limitations in Wis. Stat. § 893.21, for private party actions "upon a statute penalty or forfeiture . . .," applied.

[33] We have also, in the context of an ordinance that provides for a forfeiture, applied the following standard:

> A law regulating conduct must give adequate notice of what is prohibited, so as not to delegate "basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972). Thus, "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).

*Dog Fed'n v. City of South Milwaukee*, 178 Wis. 2d 353, 377–78, 504 N.W.2d 375 (Ct. App. 1993).

¶ 57. It is not necessary to decide which standard to apply, because we conclude that Woodman's assertions of vagueness fail even if we apply the standard for criminal statutes. Even where criminal statutes are concerned, a statute is not void for vagueness if, by the ordinary process of statutory construction, we can give a practical or sensible meaning to the statute, and this rule applies even if a statute is ambiguous. *Hahn*, 221 Wis. 2d at 677, 678. In addition, where, as in this case, the First Amendment is not implicated, the vagueness challenge must be examined in the context of the facts in the particular case. *United States v. Mazurie*, 419 U.S. 544, 550 (1975). We have already concluded the only reasonable construction of the Act is that, whether Woodman's is a wholesaler or retailer, the terminal closest to the location of the retail sale is the correct terminal to use in applying the APT formula. We have also concluded that the statutory language does not support Woodman's construction of the term "competitor." There are no ambiguities on these points, much less vagueness. As for Woodman's other assertions of vagueness, the facts in this case do not show that uncertainty about the meaning of "any cost incurred for transportation" or "other charges . . ." affected how Woodman's set its prices; nor do the facts show that uncertainty about the meaning of "direct competitor" had any relationship to Woodman's inability to prove that it comes within the exception for meeting the price of a competitor.

¶ 58. Woodman's next contends that WIS. STAT. § 100.30 violates its right to due process because the statute does not require proof of intent or wrongdoing, but instead may be violated based on the effect of a sale,

and the sale itself is prima facie evidence of the proscribed effect. However, the imposition of liability without fault—even when the statute imposes punitive sanctions—does not in itself violate due process. *State v. Stepniewski*, 105 Wis. 2d 261, 276, 314 N.W.2d 98 (1982); *State v. Collova*, 79 Wis. 2d 473, 480–84, 255 N.W.2d 581 (1977). Statutes that are within the police power of the state may impose even criminal liability on a person whose acts violate the statute, even if the person did not intend to do so. *State v. Dried Milk Products Coop.*, 16 Wis. 2d 357, 362–63, 114 N.W.2d 412 (1962).

■

¶ 59. It is well established that the police power of the state includes not only regulations or statutes designed to promote public health and safety, but also those designed to promote economic prosperity. *State v. Ross*, 259 Wis. 379, 48 N.W.2d 460 (1951); *State v. Eau Claire Oil Co.*, 35 Wis. 2d 724, 151 N.W.2d 634 (1967). Such regulations and statutes do not offend substantive due process if they are " 'not . . . unreasonable, arbitrary or capricious, and . . . the means selected . . . have a real and substantial relation to the object sought to be attained.' " *Liberty Homes, Inc. v. DIHLR*, 136 Wis. 2d 368, 374–75, 401 N.W.2d 805 (1987), citing *Nebbia v. New York*, 291 U.S. 502, 525 (1934). In examining a constitutional challenge to prior versions of WIS. STAT. § 100.30, the Wisconsin Supreme Court in *Ross* and *Eau Claire Oil Co.* applied this test and concluded that § 100.30 was constitutional. Woodman's argues that these cases are inapplicable because they concerned prior versions of the Act which prohibited only sales below statutory cost with injurious intent, and did not include injurious effect. While that is true, the principles applied in these cases are applicable here.

¶ 60. At the time *Ross* was decided, WIS. STAT. § 100.30(4) (1949) prohibited advertising, offering for sale, and sale below statutory cost "with intent of inducing the purchase of other merchandise or of unfairly diverting trade from a competitor or otherwise injuring a competitor," and evidence of such advertisement, offer, or sale was prima facie evidence of that intent. The challenger argued that this presumption was unreasonable because it amounted to a conclusion of guilt. The court rejected this argument because the statute afforded the opportunity to come forward with evidence to overcome the presumption and the opportunity to show that one of the numerous defenses applied. *Ross*, 259 Wis. at 386–87.

¶ 61. In *Eau Claire Oil Co.*, the court again considered a constitutional challenge to the same provision regarding prima facie evidence that was at issue in *Ross*. WIS. STAT. § 100.30(4) (1963).[34] The court concluded the presumption was constitutional because there was a rational connection between the facts presumed—that is, "intent to induce the purchase of other merchandise, or to unfairly divert trade from a competitor or to otherwise injure a competitor,"

---

[34] In *State v. Eau Claire Oil Co.*, 35 Wis. 2d 724, 151 N.W.2d 634 (1967), the seller also objected to the requirement under then WIS. STAT. § 100.30(2)(j) (1963) that, when items of merchandise were sold in combination but separately priced, each separate item was subject to the markup provisions of the statute. The seller asserted there was no economic justification for this when there was an overall profit, and that it was arbitrary in comparison to the manner in which gifts were treated under the statute. The court concluded that these were policy judgments for the legislature to make and were not unconstitutional. *Id.* at 735–37.

§ 100.30(4) (1963)—and the evidence of selling the items below statutory cost. *Eau Claire Oil Co.*, 35 Wis. 2d at 734.

¶ 62. Applying the principles of *Ross* and *Eau Claire Oil Co.* to the provisions of Wis. Stat. § 100.30(3) regarding the effect of sales below statutory cost, we conclude they do not offend due process. The prohibition of sales below statutory cost that have the effect of inducing the purchase of other merchandise, unfairly diverting trade from a competitor, or otherwise injuring a competitor has a real and substantial relationship to the purpose of the statute, which is to prevent the economic harms that result from such sales. Section 100.30(1). Indeed, the prohibition of sales with the specified injurious effects arguably bears a closer relationship to achieving that purpose than the prohibition with injurious intent, since the former focuses on the very results of below-cost sales that the legislature sought to protect against. For that same reason, there is a rational connection between below-cost sales and the specified injurious effects; therefore, the rebuttable presumption that evidence of the former is proof of the latter does not offend the constitution.

¶ 63. There is, finally, no question that the presumption or effect is rebuttable, like the presumption of intent at issue in *Ross*: the seller has the opportunity of presenting evidence to rebut the presumption, as well as presenting evidence of statutory defenses. *Ross*, 259 Wis. 386–87; *see also, State ex rel. Strykowski v. Wilkie*, 81 Wis. 2d 491, 531, 261 N.W.2d 434 (1978) (a rebuttable presumption that does not prevent a criminal defendant from presenting a defense or take any

question of fact from a jury does not abridge the right to a jury trial or deny due process of law).[35]

## CONCLUSION

¶ 64. We conclude the circuit court properly exercised its discretion in allowing the second amended complaint to relate back to the filing of the original complaint. We also conclude: (1) there is no genuine material factual dispute that on 293 days Woodman's sold motor vehicle fuel at less than the statutory cost and did not file a notice with DATCP under Wis. Stat. § 100.30(7) or have in its possession the evidence required by § 100.30(6)(a)7 for those sales; and (2) Woodman's did not present evidence to dispute the evidence of actual injury submitted by Gross. Accordingly, we hold that Gross is entitled as a matter of law to summary judgment that on 293 days Woodman's violated the Act, and to $2,000 for each day of violation

---

[35] Woodman's also argues that the current statute, unlike the statute at issue in *State v. Ross*, 259 Wis. 379, 48 N.W.2d 460 (1951), and *State v. Eau Claire Oil Co.*, 35 Wis. 2d 724, 151 N.W.2d 634 (1967), mandates a minimum markup, thus forcing sellers of motor vehicle fuel to set prices above those that take into account their actual costs. Woodman's does not elaborate further on the specific provisions it is challenging. Presumably Woodman's means that the specified markup for doing business is required now in all cases, whereas in earlier versions the seller could use a lower markup if it could prove its cost of doing business was less. *Cf.* Wis. Stat. § 100.30(2)(am)1m.b and c with § 100.30(2)(a) and (b) (1949) and (1963). Woodman's, however, has presented no evidence that its cost of doing business is less than the statutory markup, and the evidence is that Woodman's used the statutory markup in setting its prices. In the absence of a developed argument that relates the facts of this case to the provision Woodman's challenges, we decline to address it.

for a total of $586,000. Because the circuit court held there were 295 days of violations with a resulting award of $590,000, we affirm in part, reverse in part and remand with instructions to enter a judgment that is modified to conform to this decision. In addition, we reverse the circuit court's order that trial will be to the court and remand for a jury trial on the alleged violations for March 9 and March 12, 1999, as well as all other remaining factual issues.

*By the Court.*—Judgment and order affirmed in part; reversed in part and cause remanded with directions.

¶ 65. LUNDSTEN, J. (*dissenting*). I agree with all parts of the majority opinion, except its conclusion that Woodman's submissions did not create a disputed issue of fact regarding the "effect" of Woodman's diesel fuel pricing. Accordingly, I respectfully dissent.

¶ 66. The majority correctly concludes that Woodman's may overcome James Gross's prima facie case by showing it did not intend to violate Wis. Stat. § 100.30 and that its diesel fuel pricing did not have a negative effect covered by the statute. The majority explains that Gross sufficiently asserted injury by alleging that he lowered his diesel prices in response to Woodman's diesel prices, thereby losing revenue. Majority at ¶¶ 39, 51. The majority acknowledges that Woodman's presented evidence regarding the inconvenient location of its diesel pump, lack of marketing, and low sales volume to non-Woodman's customers, and that this evidence "creates a reasonable inference that [Woodman's] diesel fuel prices did not divert diesel customers from Gross." Majority at ¶ 51. However, in the majority's view, such evidence does not contradict Gross's assertion that he lowered his prices in response to Woodman's diesel

prices and lost revenue, thereby suffering an injurious "effect" under § 100.30(3). Majority at ¶¶ 48–51. The majority's reasoning seems to be that, regardless whether Woodman's diverted trade from Gross and regardless whether Gross sensibly lowered his diesel prices to compete with Woodman's, it is uncontroverted that Gross did lower his diesel prices in response to Woodman's prices. I view the matter differently.

¶ 67. As the majority rightly concludes, Woodman's is a "competitor" within the meaning of WIS. STAT. § 100.30(3). I agree that a party is a competitor under the statute simply by virtue of selling the same fuel product in the relevant geographic area. Majority at ¶¶ 44–45. More to the point here, I agree with the majority that, although the effort "the seller makes to market a motor vehicle fuel and the actual number of sales it makes" are not relevant to whether the seller is a "competitor," such evidence may be relevant to the effect of the seller's sales. Majority at ¶ 45. Stated differently, I agree with the majority's conclusion that just because Woodman's is a "competitor" under the statute does not necessarily mean Woodman's is the sort of competitor whose pricing has an effect on the market. I part company with the majority because I agree with Woodman's that its submissions created a factual dispute regarding Gross's assertion that he lowered his diesel fuel prices in response to Woodman's diesel fuel pricing. Woodman's factual assertions tend to show that no reasonable diesel fuel seller would care about the diesel fuel prices charged by Woodman's.

¶ 68. The affidavit of Thomas Wysocki, manager of Woodman's Onalaska store, contains the following assertions. Woodman's Onalaska store has had only one diesel pump since the store opened its fuel station. Woodman's installed the single diesel pump for the sole

235

purpose of fueling its own semi-trucks, which haul products to and from Woodman's stores. "Woodman's [diesel pump] is not readily accessible to or customer friendly for non-Woodman's semi-trucks." A semi-tractor must first drop its trailer in order to maneuver up to the pump, and there is no room in the "driveway/parking cement area of the gas station" to drop trailers. Woodman's semi drivers drop their trailers at a different location, such as the warehouse docks, before heading to the pump to fill up. Diesel fuel sales not made to Woodman's own semi-trucks are not made to other semi-trucks, but to "owners of older cars that still utilize diesel fuel." Wysocki has been the manager of Woodman's Onalaska store since it opened in 1994 and he has never seen a non-Woodman's semi-truck fill up with diesel fuel at the Woodman's station. Woodman's has no marketing policy or strategy to sell diesel fuel to the public. Woodman's did not post or advertise its diesel price. The only way a customer could determine Woodman's diesel fuel price was to read the price on the pump itself.

¶ 69. Wysocki's affidavit avers that diesel fuel sales are "insignificant" compared with sales of other types of fuels. A chart, prepared by Wysocki and attached to his affidavit, addresses the 421 days, between September 13, 1998, and June 3, 2000, on which Gross originally asserted violations. Not counting sales to Woodman's own semi-trucks, the chart documents 179 days with no diesel fuel sales at all, 227 days with less than ten gallons sold, and 275 days with less than twenty gallons sold. Thus, not counting Woodman's own trucks, the chart shows that on 42% of the days Gross initially alleged violations, Woodman's made no diesel fuel sales at all, and on 65% of those days, Woodman's sold less than twenty gallons.

¶ 70. Wysocki asserted, in contrast, that Gross's Citgo Quick Mart station advertises diesel prices, along with other fuel prices, on a sign clearly visible from an adjacent four-lane highway. Gross's diesel pumps are situated so that a semi-truck driver can easily pull right up to the pumps without dropping its trailer.

¶ 71. Based on Wysocki's assertions, it could reasonably be inferred that Gross never saw billboards or other signs advertising Woodman's as a diesel fuel seller, that Gross never saw Woodman's diesel prices posted in a place visible from the street, that Gross himself had to go up to Woodman's diesel pump to see the price, and that Gross never saw a non-Woodman's semi-truck at Woodman's diesel pump and seldom saw any vehicle at that pump. The question naturally arises whether Gross actually lowered his diesel prices in response to Woodman's diesel prices and, therefore, whether Woodman's diesel pricing and sales had any effect on Gross.

¶ 72. The majority acknowledges that Woodman's evidence "creates a reasonable inference that [Woodman's] diesel fuel prices did not divert diesel customers from Gross." Majority at ¶ 51. I conclude that this same evidence casts doubt on Gross's claim of injury. Just as the facts suggest that Woodman's did not divert diesel customers from Gross, they also suggest that Gross *knew* Woodman's posed no threat to Gross's diesel fuel business.

¶ 73. It might be argued that Woodman's failed to offer evidence contradicting Gross's assertion because Woodman's did not offer evidence showing that semi-tractors are the main market for diesel fuel. I disagree. In his deposition, Willard Woodman, president of Woodman's, (1) expressed an unspecified degree of familiarity with the market for motor vehicle fuels, (2)

237

explained what goes into Woodman's fuel pricing decisions, and (3) said he sometimes assists in making gasoline pricing decisions. Willard Woodman averred that diesel fuel is "really [a] truck stop business." Jurors could interpret this assertion, in light of common experience, to mean that semi-trucks are the main market for diesel fuel. While additional expert testimony might be desirable at trial, it is not needed to place this factual issue before a jury. "The requirement of expert testimony is an extraordinary one, and [should be] applied by the trial court only when unusually complex or esoteric issues are before the jury." *White v. Leeder*, 149 Wis. 2d 948, 960, 440 N.W.2d 557 (1989).

¶ 74. I note that the lengthy majority decision only begins to reveal the complicated factual and legal issues dealt with before the circuit court. The narrow issue I address was one of dozens. While Woodman's made the argument I adopt here, it did so primarily in the context of arguing that it was not a "competitor" under WIS. STAT. § 100.30(3) and that it did not "intend" to violate the statute. Nonetheless, Woodman's also argued, both before the circuit court and before this court, that its evidence put in dispute whether its diesel sales had an *effect* on Gross. With focused hindsight, I conclude that this argument should have prevailed.

¶ 75. Having rejected the majority's conclusion regarding "effect," I must briefly address "intent." The submissions show there is a factual dispute regarding intent with respect to diesel fuel sales. The same evidence summarized above—including the assertions that Woodman's had only one diesel pump, did not advertise its diesel price (except at the pump), and had

no diesel fuel marketing strategy—suggests there was no intent to unfairly divert trade or otherwise injure a competitor.

¶ 76. Accordingly, I would reverse the circuit court's order granting summary judgment in favor of Gross with respect to the alleged violations involving diesel fuel sales below the ATP formula.