**LOTUS BUSINESS GROUP LLC, Plaintiff,**

v.

**FLYING J INC., Defendant.**

No. 07–C–0144.

United States District Court, E.D. Wisconsin.

Oct. 12, 2007.

Opinion Denying Reconsideration Nov. 27, 2007.

See, also, 2007 WL 4206876.

Robert E. Hankel, Hankel Bjelajac Kallenbach Lehner & Koenen LLC, Racine, WI, for Plaintiff.

John W. Mackay, Jonathan A. Dibble, Ray Quinney & Nebeker PC, Salt Lake City, UT, Jon E Fredrickson, Mark M. Leitner, Kravit Hovel & Krawczyk SC, Milwaukee, WI, for Defendant.

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

WILLIAM E. CALLAHAN, JR.,
United States Magistrate Judge.

### I. PROCEDURAL AND FACTUAL BACKGROUND

This action was commenced on December 18, 2006, when the plaintiff, Lotus Business Group LLC ("Lotus"), filed a complaint in the Milwaukee County Circuit Court alleging that on numerous occasions in 2006, the defendant, Flying J Inc. ("Flying J"), engaged in the selling of motor vehicle fuel in violation of Wis. Stat. § 100.30. Specifically, Lotus alleges that Flying J's selling of motor vehicle fuel at a price below the "average posted terminal price" plus a 9.18% minimum markup at the truck stop in Black River Falls, Wisconsin was in violation of Wisconsin's minimum markup statute. On February 12, 2007, Flying J removed the action to the United States District Court for the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1441, claiming that this court has diversity jurisdiction over the action pursuant to 28 U.S.C. § 1332. On February 20, 2007, Flying J filed its answer, in which it set forth several affirmative defenses, including, *inter alia*, that enforcement of the provisions of Wis. Stat. § 100.30 would violate both the Supremacy[1] and Com-

---

1. The Supremacy Clause of the United States Constitution reads:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the land; and the Judges in every State

merce [2] Clauses of the United States Constitution.

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 and venue in the Eastern District of Wisconsin is proper pursuant to 28 U.S.C. § 1391. Both parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General L.R. 73.1 (E.D.Wis.).[3] Currently pending before the court is Flying J's motion for summary judgment, which is fully briefed and is ready for resolution. For the reasons which follow, the defendant's motion for summary judgment will be granted.

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D.Wis.), the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact. The plaintiff filed responses to the proposed findings of fact set forth by the defendant. The plaintiff filed its own additional proposed findings of fact, and the defendant filed its responses thereto. A review of the parties' respective proposed findings and the responses thereto reveal that the following are (except where noted) the undisputed facts that are relevant to the disposition of the motion for summary judgment.

Lotus is a Delaware limited liability corporation with its principal place of business at Kenosha, Wisconsin (Defendant's Proposed Findings of Fact ("DPFOF") ¶ 2.) Lotus is in the business of operating a fuel sales station under the name Lotus Travel Center in DeForest, Wisconsin. (DPFOF ¶ 3.)

Flying J is a Utah corporation with its principal place of business in the State of Utah. (DPFOF ¶ 4.) Flying J is in the business of operating fuel sales stations and operates stations at Black River Falls, Wisconsin and Oak Creek, Wisconsin. (DPFOF ¶ 5.)

In 1939, the Wisconsin legislature enacted the Unfair Sales Act, Wis. Stat. § 100.30, which created a floor on the price of motor fuel. Currently, the statute mandates a minimum markup of 9.18% above the "average terminal price," a proxy for wholesale costs based on an industry index. (DPFOF ¶ 6.) The original minimum markup in 1939 was 6%. (DPFOF ¶ 8.)

In 1939, the average retail price of gasoline in the United States was 18.8 cents per gallon. (DPFOF ¶ 7.) Since its enactment, the minimum markup has been amended once. In 1997, the Wisconsin

---

shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
U.S. CONST. art. VI, cl. 2.

**2.** The Commerce Clause of the United States Constitution states that "The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes." U.S. CONST. art. I, § 8, cl. 3.

**3.** The defendant, in a letter dated June 5, 2007, notified the Attorney General for the State of Wisconsin, J.B. Van Hollen, of its challenge to the constitutionality of Wis. Stat. § 100.30 in regards to the sale of motor fuel. In the letter, the defendant stated that "[w]e

extend an invitation to you to join us in challenging the Statute." (Def.'s Reply, Ex. 1.) In a letter dated June 27, 2007, Assistant Attorney General Gwendolyn J. Cooley notified this court that the Attorney General was declining to appear in this matter. Specifically, the letter stated:

Pursuant to Wis. Stat. § 806.04(11), this office has been furnished with a copy of certain pleadings in the above case. Please be advised that we have decided not to appear in this matter at this time. The Attorney General may seek to appear if the issue of the constitutionality of a statute or ordinance is raised on appeal. Therefore, we request the parties inform our office if the matter is appealed and the appeal raises the issue of constitutionality.

legislature amended the markup formula to require a 6% markup above certain actual costs or a 9.18% markup above the "average terminal price," whichever is greater. The amendment took effect in Wisconsin on August 1, 1998. (DPFOF ¶ 8.)

In August 1998, the average retail price of regular gasoline in the United States was $1.03 per gallon, and the average retail price of diesel fuel was $1.01 per gallon. (DPFOF ¶ 9.) In September 2006, the average price of regular gasoline was $2.43 per gallon. (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 4.) In May 2007, in the Midwest region of the United States the average retail price of regular gasoline was $3.32 per gallon, and the average price of diesel fuel was $2.78 per gallon. (DPFOF ¶ 11.)

Since 1998, inflation has been approximately 27%, and gasoline prices have increased over 200%. (DPFOF ¶ 12.)

In May 2007, fuel prices in Wisconsin reached $3.49 per gallon for regular gasoline and $2.99 per gallon for diesel fuel. (DPFOF ¶ 13.)

In May 2007, the cost to Flying J to purchase regular gasoline was approximately between $3.43 and $3.03 per gallon, and the cost to purchase diesel fuel was approximately between $2.82 and $2.63 per gallon. (DPFOF ¶ 14.)

Applying Wisconsin's 9.18% minimum markup and assuming that the retailer purchases at "average terminal price" under the statute, a gallon of gasoline that retails at $3.49 per gallon has a built in markup price of approximately $0.32 per gallon. A gallon of diesel fuel that retails at $2.99 has a built in markup price of approximately $0.27 per gallon. (DPFOF ¶ 15.)

The Federal Trade Commission performed a detailed analysis criticizing the Wisconsin Unfair Sales Act in 2003. (DPFOF ¶ 18; Ex.C, Federal Trade Commission, Re: Wisconsin's Unfair Sales Act (October 15, 2003, available at http://www.ftc.gov/be/v030015.shtm.)) In October 1999, the Wisconsin Policy Research Institute issued a report concluding that the Act has "kept gasoline prices higher than would otherwise be the case." (DPFOF ¶ 19; Ex. D.)

A 2004 study at the University of Wisconsin–Whitewater concluded that states with "sales below costs" laws average lower gas prices. (PPFOF ¶ 5; Ex. E.)

## II. SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting advisory committee's note to 1963 amendment of Fed.R.Civ.P. 56(e)). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir.2001). To state it differently, " '[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion.' " *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir.2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir.1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir.2003) (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). " 'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.' " *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir.1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.' " *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir.2001) (quoting *Johnson v. Univ. of Wisconsin–Eau Claire*, 70 F.3d 469, 477 (7th Cir.1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

## III. DISCUSSION

The Wisconsin Unfair Sales Act prohibits, *inter alia*, retailers of motor fuel from selling fuel below "cost":

> Any sale of any item of merchandise either by a retailer, wholesaler, wholesaler of motor vehicle fuel or refiner, at less than cost as defined in this section with the intent or effect of inducing the purchase of other merchandise or of unfairly diverting trade from a competitor, impairs and prevents fair competition, injures public welfare and is unfair competition and contrary to public policy and the policy of this section. Such sales are prohibited. Evidence of any sale of any item of merchandise by any retailer, wholesaler, wholesaler of motor vehicle fuel or refiner at less than cost as defined in this section shall be prima facie evidence of intent or effect to induce the purchase of other merchandise, or to unfairly divert trade from a competitor, or to otherwise injure a competitor.

Wis. Stat. § 100.30(3).

The statute defines "cost to retailer" as:

> In the case of the retail sale of motor vehicle fuel by a person other than a refiner or a wholesaler of motor vehicle fuel at a retail station, the invoice cost of the motor vehicle fuel to the retailer within 10 days prior to the date of sale, or the replacement cost of the motor vehicle fuel, whichever is lower, less all trade discounts except customary discounts for cash, plus any excise, sales or use taxes imposed on the motor vehicle fuel or on its sale and any cost incurred for transportation and any other charges

not otherwise included in the invoice cost or the replacement cost of the motor vehicle fuel, plus a markup of 6% of that amount to cover a proportionate part of the cost of doing business; or the average posted terminal price at the terminal located closest to the retailer plus a markup of 9.18% of the average posted terminal price to cover a proportionate part of the cost of doing business; whichever is greater.

Wis. Stat. § 100.30(2)(am)lm.c.[4]

The "average posted terminal price," on which the 9.18% minimum markup is based, is defined as:

the average posted rack price, as published by a petroleum price reporting service, at which motor vehicle fuel is offered for sale at the close of business on the determination date by all refiners and wholesalers of motor vehicle fuel at a terminal plus any excise, sales or use taxes imposed on the motor vehicle fuel or on its sale, any cost incurred for transportation and any other charges that are not otherwise included in the average posted rack price. In this paragraph, "average" means the arithmetic mean.

Wis. Stat. § 100.30(2)(a).

## A. Commerce Clause

█ Flying J argues that the minimum markup statute violates the dormant Commerce Clause because the burden imposed on interstate commerce is excessive in relation to the putative local benefits of the statute. Specifically, Flying J contends that the putative local benefits are minimal because the statute, despite its stated purpose, fails in reality to foster fair competition and prevent below cost sales. In contrast, according to Flying J, the burden on

interstate commerce is excessive because companies are forced to surrender competitive advantages, the statute allows for rebates and cost-plus pricing resulting in potential technical violations of the minimum markup statute, and the State's objective in preventing below cost sales could be accomplished by a less burdensome and more effective regulatory scheme.

"The so-called 'dormant commerce clause' prohibits the various states from discriminating against or burdening items in the interstate stream of commerce." *Eby–Brown Co. v. Wis. Dep't of Agric.*, 295 F.3d 749, 756 (7th Cir.2002) (citing *Oregon Waste Sys. v. Dept. of Envtl. Quality*, 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)). "In examining whether a state enactment violates the 'dormant' aspect of the commerce clause, courts must first determine if the regulation provides 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Id.* (quoting *Oregon Waste*, 511 U.S. at 99, 114 S.Ct. 1345). "Non-discriminatory state laws that have only an incidental effect upon interstate commerce will be considered valid unless 'the burden imposed on such commerce is clearly excessive in relation to putative local benefits.'" *Id.* (quoting *Oregon Waste*, 511 U.S. at 99, 114 S.Ct. 1345).

To begin with, the minimum markup statute applies equally to both in-state and out-of-state fuel retailers that do business in Wisconsin. Such being the case, the statute is a non-discriminatory state law which is valid unless the burden on interstate commerce is clearly excessive. I conclude that the minimum markup statute

---

**4.** Wis. Stat. 100.30(lm) also contains definitions of "cost to retailer" for various other types of motor fuel retailers, such as retail stations owned by the refiner and retail stations owned by the wholesaler. Included in these definitions of "cost to retailer" are minimum markups ranging from 3% to 9.18% based on "average posted terminal price."

does not excessively burden interstate commerce.

Flying J's primary argument is that the minimum markup statute forces it to surrender its competitive advantage as a national chain. However, as stated by the Seventh Circuit in another case challenging the constitutionality of the Unfair Sales Act, "[t]he fact that doing business in Wisconsin has become more difficult for [the company] does not mean that the Act violates the principles of interstate commerce." *Eby–Brown*, 295 F.3d at 757 (holding that the Unfair Sales Act's price system regarding cigarette distributors did not violate the Commerce Clause). Moreover, any actual difficulties faced by Flying J do not appear particularly severe. Indeed, although Flying J may be unable to employ its efficiencies to lower its retail prices, the lower actual costs created by its efficiencies would presumably lead to greater profit margins due to the minimum markup requirement.

Furthermore, the fact that there may be less burdensome or more efficient methods for Wisconsin to prevent below cost pricing is largely immaterial to the issue of whether the Act excessively burdens interstate commerce. At issue is whether the Act is excessively burdensome to interstate commerce, not whether the Act is the least burdensome or most efficient method of achieving the State's objectives.

In sum, Flying J has failed to demonstrate that the minimum markup statute discriminates against out-of-state interests or is excessively burdensome on interstate commerce. Such being the case, I find that the minimum markup statute does not violate the Commerce Clause.

## B. Supremacy Clause

Flying J also argues that the 9.18% minimum markup provision on motor fuel sales within the Wisconsin Unfair Sales Act restrains trade in contravention of the Sherman Act, 15 U.S.C. § 1, and fails to qualify for "state action" immunity from the Sherman Act. Thus, the Act, at least as it applies to motor vehicle fuel, is unenforceable under the Supremacy Clause.

The threshold question to address is whether the minimum markup provision is inconsistent with federal antitrust laws. *See 324 Liquor Corp. v. Duffy*, 479 U.S. 335, 341, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987); *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 102, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). As noted by the Supreme Court, "[r]esale price maintenance has been a *per se* violation of § 1 of the Sherman Act * since the early years of national antitrust enforcement.'" *324 Liquor Corp.*, 479 U.S. at 341, 107 S.Ct. 720 (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). Although a vertical restraint on resale prices imposed by a single manufacturer or wholesaler may not be inconsistent with antitrust laws because it could stimulate interbrand competition, "[m]andatory industrywide resale price fixing is virtually certain to reduce interbrand competition as well as intrabrand competition, because it prevents manufacturers and wholesalers from allowing or requiring retail price competition." *Id.* at 342, 107 S.Ct. 720.

Given that the Wisconsin minimum markup statute fixes resale prices industrywide, this particular provision of the statute is inconsistent with § 1 of the Sherman Act. *See 324 Liquor*, 479 U.S. at 342, 107 S.Ct. 720 (holding that New York statute which forbids all retailers from reducing the minimum prices set by wholesalers was inconsistent with § 1 of the Sherman Act.); *see also Midcal*, 445 U.S. at 102–103, 100 S.Ct. 937 (California statute conflicted with the Sherman Act because it mandated resale price mainte-

nance, an activity long regarded as *a per se* violation 5 of the Sherman Act). As with the statute in *324 Liquor*, the Wisconsin statute applies to all wholesalers and retailers of motor fuel, and specifically forbids retailers from reducing the minimum resale prices established by wholesalers and the minimum markup percentage.

Nevertheless, although the Wisconsin minimum markup statute is inconsistent with the Sherman Act, in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), "the Court held that the Sherman Act does not apply 'to the anticompetitive conduct of a State acting through its legislature.'" *324 Liquor*, 479 U.S. at 343, 107 S.Ct. 720 (quoting *Hallie v. Eau Claire*, 471 U.S. 34, 38, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985)). Therefore, the next question that must be addressed is "whether [Wisconsin's] involvement in the price-setting program is sufficient to establish antitrust immunity under *Parker v. Brown*." *Midcal*, 445 U.S. at 103, 100 S.Ct. 937.

Under principles of federalism and state sovereignty, " 'an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.'" *Id.* at 104, 100 S.Ct. 937 (quoting *Parker*, 317 U.S. at 351, 63 S.Ct. 307). However, " 'a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful.'" *Parker*, 317 U.S. at 351, 63 S.Ct. 307.

■ The Supreme Court has established a two-part test for determining antitrust immunity under *Parker*. "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *Midcal*, 445 U.S. at 105, 100 S.Ct. 937 (quoting *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)).

■ Flying J argues that the Wisconsin statute fails to meet either prong of the two-part test. First, Flying J contends that the statute's policy is not "clearly articulated" because the provisions of the statute are at odds with the statute's policy statement. The policy underlying the Unfair Sales Act is set forth in Wis. Stat. 100.30(1):

(1) POLICY.

The practice of selling certain items of merchandise below cost in order to attract patronage is generally a form of deceptive advertising and an unfair method of competition in commerce. Such practice causes commercial dislocations, misleads the consumer, works back against the farmer, directly burdens and obstructs commerce, and diverts business from dealers who maintain a fair price policy. Bankruptcies among merchants who fail because of the competition of those who use such methods result in unemployment, disruption of leases, and nonpayment of taxes and loans, and contribute to an inevitable train of undesirable consequences, including economic depression.

Flying J argues that, despite this stated policy which purports to address "below cost" pricing, the statutory minimum markup provisions are not linked to actual costs and create high profits for inefficient gasoline retailers. Flying J notes that the statute makes estimates about wholesale costs rather than relying on actual costs, and contends that the 9.18% markup is arbitrary and greatly exceeds the actual costs of selling fuel or conducting business. As such, according to Flying J, a clearly articulated policy statement would express the State's desire to impose uncompetitive and unreasonably high margins and fuel prices on consumers regardless of the actual costs to retailers. (Def.'s Br.at 9.)

Having considered Flying J's arguments, I conclude that the State's minimum markup system meets the first requirement for state action antitrust immunity under *Parker*. The legislative policy underlying the markup system "is forthrightly stated and clear in its purpose"; it is to regulate the sale of merchandise below "cost" in order to prevent "deceptive advertising" and "unfair method(s) of competition in commerce." *See Midcal*, 445 U.S. at 105, 100 S.Ct. 937. To be sure, Flying J argues that the statute's use of estimates of wholesale costs and a 9.18% markup actually imposes requirements designed to limit competition on prices above actual costs. However, the statute does not define "cost" as each individual retailer's "actual cost," such that there must be an individualized calculation of the actual costs for each retailer. Rather, the definition of "cost to retailer" includes, among other things, "the average posted terminal price at the terminal located closest to the retailer plus a markup of 9.18% of the average posted terminal price to cover a proportionate part of the cost of doing business." Such being the case, whether the estimates of wholesale costs or the markup of 9.18% are accurate calculations of the actual costs have no bearing on whether the statute is clear in its purpose of regulating sales below the statutory definition of "cost." Moreover, the statute's effectiveness in accomplishing its purpose is immaterial to whether the statute is clear in stating its purpose.

However, Flying J also contends that Wisconsin's minimum markup system is not "actively supervised" by the State. Specifically, Flying J argues that the statute's definition of "cost" does not relate to the retailer's actual cost, but rather is based on the "average" cost faced by competitors. This definition of "cost," according to Flying J, facilitates cartel-like maintenance of artificially high prices. Flying J contends that Wisconsin does not actively supervise the actual costs, the amount of markup, the profit margins, or the fuel prices charged by retailers under the statute. In support of such contention, Flying J points to the fact that the State of Wisconsin has only adjusted the minimum markup formula once since the statute's enactment in 1939. Flying J notes that this adjustment was implemented nine years ago, at which time the average price of unleaded regular gasoline was $1.03 per gallon. (Def.'s Br. at 10.)

In further support of its argument, Flying J cites the Supreme Court's decisions in *Midcal* and *324 Liquor*, in which the Supreme Court struck down state pricing statutes because the statutes were not entitled to antitrust immunity under *Parker*. In *Midcal*, the Supreme Court struck down a California wine pricing statute because the pricing system was not "actively supervised" by the State. 445 U.S. at 106, 100 S.Ct. 937. The statute in question required all wine producers, wholesalers, and rectifiers to file fair trade contracts or price schedules with the State. *Id.* at 99, 100 S.Ct. 937. If the wine producer did not set prices through a fair trade contract, wholesalers were required to post a resale price schedule for that producer's brands. *Id.* The State statute provided that a single fair trade contract or schedule for each brand set the terms for all wholesale transactions in that area for that brand. *Id.* Similarly, the wine prices posted by a single wholesaler set the terms for all wholesale transactions in that area. *Id.* at 99–100, 100 S.Ct. 937. No state-licensed wine merchant could sell wine to a retailer at a price other than the price set in either an effective price schedule or in an effective fair trade contract. *Id.* at 99, 100 S.Ct. 937. A licensee who sold wine below the established prices faced fines,

license suspension, or outright license revocation. *Id.* at 100, 100 S.Ct. 937. The State had no direct control over the wine prices, and did not review the reasonableness of the prices set by the wine dealers. *Id.*

The Supreme Court invalidated the statute in *Midcal,* holding that the wine pricing program did not meet the second prong *of Parker:*

> The State simply authorizes price setting and enforces the prices established by private parties. The State neither establishes prices nor reviews the reasonableness of the price schedules; nor does it regulate the terms of fair trade contracts. The State does not monitor market conditions or engage in any "pointed reexamination" of the program. The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement. As *Parker* teaches, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful . . . ."

*Midcal,* 445 U.S. at 105–106, 100 S.Ct. 937.

Similarly, in *324 Liquor,* the Supreme Court invalidated New York's liquor-pricing system because it was not actively supervised by the State. 479 U.S. at 344, 107 S.Ct. 720. The statute in question in *324 Liquor* required wholesalers of liquor to file, or "post," monthly price schedules with the State Liquor Authority ("SLA"). *Id.* at 337, 107 S.Ct. 720. The law did not require that the posted case price bear any relation to the posted bottle price. *Id.* at 338, 107 S.Ct. 720.

Under the New York statute, retailers could not sell liquor below "cost." *Id.* "Cost" was defined in the statute as "the price of such item of liquor to the retailer plus twelve percentum of such price." *Id.* "Price" was defined as the posted bottle price in effect at the time the retailer sold or offered to sell the item. *Id.* at 339, 107 S.Ct. 720. The Supreme Court noted that "although the statute defines retail cost in terms of the wholesaler's posted bottle price, retailers generally purchase liquor by the case." *Id.* The SLA had expressly authorized wholesalers to reduce, or "post off," the case price without reducing the posted bottle price. *Id.*

The Supreme Court found that, given the wholesalers' ability to reduce case price without reducing the posted bottle price, wholesalers could compel retailers to charge greater than 112 percent of the actual wholesale cost. *Id.* at 339–40, 107 S.Ct. 720. The Supreme Court noted that New York wholesalers advertised in trade publications that their "post offs" would guarantee retailers large markups, at times in excess of 30 percent. *Id.* at 340, 107 S.Ct. 720. Moreover, the Supreme Court found that, because the statute defined "cost" in terms of the posted bottle price in effect at the time the retailer sells or offers to sell the item, wholesalers could sell to retailers large quantities in a month when prices are low and then require that retailers sell at an abnormally high markup by raising the bottle price in later months. *Id.* The Supreme Court concluded that the "New York retail pricing system thus permits wholesalers to set retail prices, and retail markups, without regard to actual retail costs," and that "[t]he effect of this complex of statutory provisions and regulations is to permit wholesalers to maintain retail prices at artificially high levels." *Id.*

Although the Supreme Court in *324 Liquor* determined that New York's liquor-pricing statute met the first prong of *Parker's* immunity test, the Court held that the statute failed the second prong because it was not actively supervised by the

State. *Id.* at 344, 107 S.Ct. 720. Specifically, the Court found that:

[a]s in *Midcal,* the State "simply authorizes price setting and enforces the prices established by private parties." 445 U.S., at 105, 100 S.Ct. 937. New York "neither establishes prices nor reviews the reasonableness of the price schedules." *Ibid.* New York "does not monitor market conditions or engage in any 'pointed reexamination' of the program." *Id.,* at 106, 100 S.Ct. 937 (quoting *Bates v. State Bar of Arizona,* 433 U.S. 350, 362, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977)). Each wholesaler sets its own "posted" prices; the State does not control month-to-month variations in posted prices. Nor does the State supervise the wholesaler's decision to "post off," the amount of the "post off," the corresponding decrease, if any, in the bottle price, or the frequency with which a wholesaler posts off. The State has displaced competition among liquor retailers without substituting an adequate system of regulation. "The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." 445 U.S., at 106, 100 S.Ct. 937.

*Id.* at 344–45, 107 S.Ct. 720.

The Supreme Court held that the New York statute was invalid. In doing so, however, the Court did note that "[a] simple 'minimum markup' statute requiring retailers to charge 112 percent of their actual wholesale cost may satisfy the 'active supervision' requirement, and so be exempt from the antitrust laws under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943)." *Id.* at 345, n. 6, 63 S.Ct. 307 (citing *Morgan v. Division of Liquor Control, Dept. of Business Regulation,* 664 F.2d 353 (2nd Cir.1981)).

In *Morgan,* the Second Circuit held that Connecticut's liquor pricing statute was "actively supervised" because the State structured "a detailed mechanism for determining prices for alcoholic beverages." 664 F.2d at 356. The statute at issue in *Morgan* required wholesalers to file a monthly list of prices at which it would sell its products to retailers. *Id.* at 355. Under the statute, the listed prices could not be less than a wholesaler's "cost." *Id.* "Cost" was defined in the statute to include factors such as "actual cost, transportation charges, insurance and a minimum markup of 11% on hard liquor, 20% on beer, 20% on wine not bottled in Connecticut, and 36% on wine bottled in Connecticut." *Id.* Retailers were also not allowed to charge below their "cost," with "cost" defined as the retailer's "'bottle price' plus a markup of 21.5% on spirits, 28% on cordials, 23% on beer, and 33.3% on wine." *Id.*

The court in *Morgan* distinguished the Connecticut statute from the California statute that was examined in *Midcal,* noting that:

the State of Connecticut establishes the markup and does not permit private parties to engage in resale price maintenance. The State of Connecticut does not control the initial offering price determined by the manufacturers or out-of-state shipper. Once that price is reported and without any compulsion or participation by the State, the statutory scheme defines the wholesale and retail prices which must be charged. Unlike the California statute in *Midcal,* the Connecticut statutes do not authorize or compel private parties to enter contracts or combinations to fix prices in violation of § 1 of the Sherman Act.

664 F.2d at 355.

The Supreme Court in *324 Liquor* found that the New York statute, unlike the Connecticut statute in *Morgan,* was "not a simple minimum markup statute because

it imposes a markup on the 'posted bottle price,' a price that may greatly exceed what the retailer actually paid for the liquor." 479 U.S. at 345, n. 6, 107 S.Ct. 720. Moreover, the Supreme Court in *324 Liquor* found that, even if the State based its markup on case price rather than only bottle price, this still "would not prevent wholesalers from selling large quantities at low prices in one month, and then requiring retailers to charge abnormally high markups by raising bottle prices in subsequent months." *Id.* Consequently, the Supreme Court stated that it could not "accept appellees' suggestion that such unsupervised price fixing should be tolerated as a reasonable accounting method or as a hedge against inflation," and thus had "no occasion to consider whether a simple minimum markup statute would be entitled to antitrust immunity." *Id.*

Although Wisconsin's minimum markup statute bears some similarities to the Connecticut statute in *Morgan,* the Wisconsin statute is not "[a] simple 'minimum markup' statute requiring retailers to charge [a percentage] of their *actual wholesale cost*" which the Supreme Court indicated may be exempt from the antitrust laws under *Parker. Id.* (emphasis added). To be sure, as with the Connecticut statute in *Morgan,* the State of Wisconsin does not control the cost of fuel charged to the retailer, but rather defines the retail prices which must be charged in order to constitute a price above cost. Moreover, the State of Wisconsin establishes the markup and prohibits private parties from selling below "cost," with the definition of "cost" including the statutory markup and an estimate of wholesale costs based on an average of actual wholesale prices.

However, unlike the Connecticut statute in *Morgan,* the Wisconsin statute defines cost not only as actual wholesale cost, but also as the "average posted terminal price at the terminal located closest to the retailer." Such being the case, the 9.18% markup is not based on the actual cost to the retailer, but rather is based on the average price available to the retailer's competitors. This average price may be significantly higher than the actual cost to a particular retailer. Yet, the statute requires the retailer to set prices based on this average price if the average price is greater than the retailer's actual cost.[5]

The use of average price rather than actual cost to determine retail prices, as well as the continued use of a 9.18% markup despite dramatic increases in the costs of fuel to retailers, does raise concerns about a lack of active supervision by the State analogous to that in *Midcal* and in *324 Liquor.* It is true that Wisconsin's minimum markup statute has certain features distinct from *Midcal* and *324 Liquor.* After all, the State of Wisconsin does not require or allow private parties to post fixed prices which must then be followed by other private parties. Moreover, in contrast to the New York statute in *324 Liquor,* wholesalers of gasoline do not have the ability to "post off*" in order to create artificially high profit margins for retailers.

However, similar to the New York statute in *324 Liquor,* Wisconsin's statute provides gasoline wholesalers with the power to set retail prices and retail markups for a gasoline retailer without regard to that retailer's actual wholesale cost. Indeed, a retailer is *required* under Wisconsin's stat-

---

**5.** The Wisconsin statute mandates that the "cost to retailer," which forms the basis for the retailer's minimum resale price, be the greater of the retailer's actual costs plus a 6% markup, or the "average posted terminal price at the terminal located closest to the retailer" plus a 9.18% markup. As such, if the average terminal price is greater than the retailer's actual costs, this average terminal price plus 9.18% is necessarily greater than the retailer's actual costs plus 6%.

ute to set prices based on the "average posted terminal price" if this average price is greater than the retailer's actual cost. Although Wisconsin controls the minimum markup amount, Wisconsin does not determine whether the "average posted terminal price" bears a close (or any) relationship to the actual price paid by retailers. As such, this "average posted terminal price" may greatly exceed what a particular retailer actually paid for gasoline. Moreover, as in *324 Liquor*, Wisconsin "does not control month-to-month variations" in wholesale prices, does not establish prices, and does not "review[ ] the reasonableness" of prices. 479 U.S. at 345, 107 S.Ct. 720.

In addition to failing to actively supervise the "cost to retailers," Wisconsin has failed to actively supervise the minimum markup percentage. As was the case with California in *Midcal* and New York in *324 Liquor*; Wisconsin "does not monitor market conditions or engage in any 'pointed reexamination' of the program." *Midcal*, 445 U.S. at 106, 100 S.Ct. 937. That this is so is evidenced by the fact that the minimum markup percentage has remained stable at 9.18% despite an increase in gasoline prices of approximately 200% since the statute was amended in 1998. *See Kansas v. Lamb*, 1987 WL 12158 (D.Kan. 1987) (in holding that a minimum markup law was not actively supervised, noting that "[t]he minimum markup percentage on distilled spirits and wines has been changed only once in the last ten years. This fact reflects a complete abdication of the system to the wholesale distributors."). Given that a markup of 9 cents per gallon was deemed an accurate estimate of the "costs of doing business" in 1998, it seems curious that a markup of 25 to 30 cents per gallon, which is approximately 200% greater than the markup in 1998, is an accurate estimate of the "costs of doing business" in 2007. Market conditions have no doubt changed drastically since 1998, but there

have been no changes to the provisions of the minimum markup statute to reflect these changed conditions.

The plaintiff asks the court to take judicial notice of the fact that "the public, media, and elected government officials have engaged in considerable discussion and scrutiny regarding all aspects of motor vehicle fuel pricing and the potential of price gouging, usually directed at the major oil companies, refineries, and distributors, as opposed to retail gas outlets." (PL's Br. at 2.) In support, the plaintiff points to an article in the Milwaukee Journal Sentinel from February 12, 2007 describing a proposal to tax oil companies but bar these companies from passing the tax on to consumers. The article describes debate among government officials as to the legality and effectiveness of the proposed tax. (Sharma Aff., Ex. F.) However, although this article may indicate that officials have had some discussion on issues related to gas prices, it offers no indication that officials have specifically discussed the minimum markup statute and its effects on retail gas prices.

Moreover, even if there was evidence of considerable discussion of the minimum markup statute, this is not enough to satisfy the second requirement of *Midcal*. In *324 Liquor*, the Supreme Court addressed the argument that the State actively supervised the liquor-pricing system because the state legislature frequently considered proposals to amend the liquor-pricing system, and the SLA could respond to changing market conditions by allowing individual wholesalers to depart from posted prices, or by allowing individual retailers to sell below the statutory definition of "cost." 479 U.S. at 345, n. 7, 107 S.Ct. 720. In rejecting this argument, the Supreme Court found that "[n]either the 'monitoring' by the SLA, nor the periodic reexaminations by the state legislature, exerts any

significant control over retail liquor prices or markups." *Id.* Likewise, even assuming that there has been ample discussion of the minimum markup statute, and that the statute has been subject to periodic reexaminations by the Wisconsin legislature, this still does not constitute active supervision by the State. As noted above, the provisions of the minimum markup statute have remained unchanged since 1998 despite dramatic changes to market conditions. Mere debate or discussion without the undertaking of any action does not satisfy the second requirement of *Midcal.*[6]

Simply stated, it is my opinion that, under the umbrella of the minimum markup statute, "[t]he State has displaced competition among [gasoline] retailers without substituting an adequate system of regulation." *324 Liquor,* 479 U.S. at 345, 107 S.Ct. 720. The State of Wisconsin, by defining "cost" as the "average terminal price," allows wholesalers to set retail prices and retail markups without regard to the actual wholesale costs. Moreover, the State of Wisconsin has not actively monitored the rapidly rising wholesale costs of gasoline or engaged in any "pointed reexamination" of the minimum markup statute to determine whether the current minimum markup percentage is still an accurate reflection of the "cost of doing business."[7] As with the statutes in *Midcal* and *324 Liquor,* "[t]he national policy

in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." *324 Liquor,* 479 U.S. at 345, 107 S.Ct. 720 (quoting *Midcal,* 445 U.S. at 106, 100 S.Ct. 937).

To be sure, the plaintiff argues that the Seventh Circuit upheld the constitutionality of Wisconsin's minimum markup statute in *Eby–Brown Company, LLC v. Wisconsin Department of Agriculture,* 295 F.3d 749 (7th Cir.2002). The plaintiff is correct. Nevertheless, *Eby* is not dispositive on the core issue presented in this case. In *Eby,* the plaintiff, which was a wholesale distributor of tobacco products, food items and sundries, challenged the Unfair Sales Act, Wis. Stat. § 100.30, on certain constitutional grounds. Specifically, Eby claimed that several provisions of the Act violated both its right to equal protection and its right to substantive due process. Eby also contended that the Act violated the commerce clause because it unfairly burdened interstate commerce. The Seventh Circuit rejected Eby's claims. However, what was not presented or addressed in *Eby* was whether the statute was entitled to state action antitrust immunity under *Parker.* And that is the precise issue which is presented in this case.[8]

In sum, the facts as presented in this case demonstrate that Wisconsin's mini-

---

**6.** If the State of Wisconsin does engage in "active" supervision of the minimum markup statute as it relates to motor vehicle fuel, no facts have been presented to this court by either party demonstrating such to be the case. Moreover, because it elected not to appear and participate in this lawsuit, the State of Wisconsin has likewise not provided any evidence demonstrating that it actively supervises the minimum markup statute as it relates to motor vehicle fuel.

**7.** During oral argument on the defendant's motion, counsel for the defendant aptly described the State's failure to actively supervise

the minimum markup scheme for motor vehicle fuel as akin to placing the scheme on "autopilot."

**8.** Similarly, in *State of Wisconsin v. Eau Claire Oil Co.,* 35 Wis.2d 724, 151 N.W.2d 634 (1967) and *Gross v. Woodman's Food Market, Inc.* 259 Wis.2d 181, 655 N.W.2d 718 (Ct.App. 2002), constitutional attacks on the statute were rejected by the Wisconsin state courts. Once again, however, in neither of those cases was the statute's enforceability challenged on the basis of its not being entitled to state action antitrust immunity under *Parker.*

mum markup statute (at least as it applies to motor vehicle fuel) is not actively supervised by the State, and thus fails to meet the second requirement *of Midcal.* Consequently, the Wisconsin minimum markup statute, insofar as it applies to motor vehicle fuel, is not entitled to state action antitrust immunity under *Parker.* And because the court finds that the statute is not entitled to state action antitrust immunity under *Parker,* it necessarily follows that the plaintiff's claims, which are predicated on alleged violations of the statute, insofar as it applies to motor vehicle fuel, must be dismissed. Flying J's motion for summary judgment will therefore be granted.

**NOW THEREFORE IT IS ORDERED** that the defendant's *motion* for summary judgment be and hereby is **GRANTED;**

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED;**

**SO ORDERED.**

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION TO ALTER JUDGMENT AND FOR RECONSIDERATION AND GRANTING DEFENDANT'S MOTION TO DISMISS COUNTERCLAIM

### I. PROCEDURAL BACKGROUND

On October 12, 2007, this court issued a decision and order granting the defendant's motion for summary judgment. Thereafter, on October 19, 2007, plaintiff Lotus Business Group LLC ("Lotus") filed a motion to alter judgment and for reconsideration. On November 6, 2007, the defendant filed its response to the plaintiff's motion. The plaintiff's motion to alter judgment and for reconsideration is now fully briefed and is ready for resolution. For the reasons which follow, the plaintiff's motion will be denied.

Furthermore, on October 31, 2007, defendant Flying J Inc. ("Flying J") filed a motion to dismiss counterclaim pursuant to Fed.R.Civ.P. 41. The plaintiff has filed no response to the defendant's motion. The defendant's motion will be granted.

### II. LEGAL STANDARDS

A Rule 59(e) motion " 'is not intended to allow the parties to relitigate old issues, to advance new theories, or to rehear the merits of a case.' " *Diebitz v. Arreola,* 834 F.Supp. 298, 302 (E.D.Wis.1993) (quoting *Renfro v. City of Emporia, Kansas,* 732 F.Supp. 1116, 1117 (D.Kan.1990)). "A Rule 59(e) motion may be granted only if 'there has been a mistake of law or fact or new evidence has been discovered that is material and could not have been discovered previously.' " *Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 785 n. 13 (7th Cir.1994) (quoting *Figgie Int'l, Inc. v. Miller,* 966 F.2d 1178, 1179 (7th Cir.1992)); *see also Federal Deposit Ins. Corp. v. Meyer,* 781 F.2d 1260, 1268 (7th Cir.1986) ("Motions for a new trial or to alter or amend a judgment must clearly establish either a manifest error of law or fact or must present newly discovered evidence."). And the decision whether to grant such motions is left to the sound discretion of the trial court. *Diebitz,* 834 F.Supp. at 302–303 (citing *Leigh v. Engle,* 723 F.Supp. 1272, 1273 (N.D.Ill.1989)).

In *Database America, Inc., v. Bellsouth Advertising and Publishing Corp.,* 825 F.Supp. 1216, 1220 (D.N.J.1993), the court held that:

A motion for reconsideration or to alter or amend a judgment may be made for one of three reasons: "(1) [A]n intervening change in the controlling law has occurred, (2) evidence not previously available has become available, or (3) it is necessary to correct a clear error of law or prevent manifest injustice." . . .

A motion for reconsideration is not a vehicle to reargue the motion or to present evidence which should have been raised before.... "A party seeking reconsideration must show more than a disagreement with the Court's decision, and 'recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden.'"

*Id.*

Lotus argues that the recent decision of the United States Supreme Court in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* —— U.S. ——, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) holds that vertical price restraints are to be judged according to the rule of reason rather than the *per se* rule. As such, according to Lotus, a rule of reason determination is required prior to a finding of whether a vertical price restraint is a violation of the Sherman Antitrust Act.

## III.  DISCUSSION

In *Leegin,* the Supreme Court held that "[v]ertical price restraints are to be judged according to the rule of reason." 127 S.Ct. at 2725. In doing so, the Supreme Court overruled the holding in *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), which stated that vertical price restraints were a *per se* violation of the Sherman Act. Under the rule of reason, " 'the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'" *Leegin,* 127 S.Ct. at 2712 (quoting *Continental T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)). "Appropriate factors to take into account include 'specific information about the relevant business' and 'the restraint's history, nature, and effect.'" *Id.* (quoting *State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997)).

"Whether the businesses involved have market power is a further, significant consideration." *Id.*

In contrast, "[r]esort to *per se* rules is confined to restraints, like those mentioned [horizontal agreements among competitors to fix prices or to divide markets], 'that would always or almost always tend to restrict competition and decrease output.'" *Id.* at 2713 (quoting *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988)). "[T]he *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue ... and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Id.*

Given the Supreme Court's holding in *Leegin,* Lotus is correct in arguing that vertical price restraints are to be judged according to the rule of reason rather than the *per se* rule. Nevertheless, more particularly applying the holding in *Leegin* would not alter this court's decision that Wisconsin's minimum markup statute violates the Sherman Act. In its Decision and Order of October 12, 2007, this court did not predicate its holding that the Wisconsin minimum markup statute was inconsistent with the Sherman Act on the proposition that vertical restraints on resale prices were a *per se* violation of § 1 of the Sherman Act. Rather, this court held that the Wisconsin minimum markup statute was inconsistent with the Sherman Act because the statute "fixes resale prices industrywide," and "[m]andatory industrywide resale price fixing is virtually certain to reduce interbrand competition as well as intrabrand competition, because it prevents manufacturers and wholesalers from allowing or requiring retail price competition." (Decision and Order at 10) (quoting

*324 Liquor Corp. v. Duffy*, 479 U.S. 335, 342, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987)).

That a statute which fixes resale prices industrywide is virtually certain to reduce interbrand competition, and therefore violates the Sherman Act, is a finding that is consistent with the Supreme Court's decision in *Leegin*. As noted by the Supreme Court in *Leegin*, "the antitrust laws are designed primarily to protect interbrand competition, from which lower prices can later result." 127 S.Ct. at 2718. Moreover, the Court in *Leegin* stated that, in contrast to a situation where "only a few manufacturers lacking market power adopt the practice, ... [r]esale price maintenance should be subject to more careful scrutiny ... if many competing manufacturers adopt the practice." *Id.* at 2719 (citing F.M. Scherer & D. Ross, Industrial Market Structure and Economic Performance 558 (3d ed.1990) (finding that "except when [resale price maintenance] spreads to cover the bulk of an industry's output, depriving consumers of a meaningful choice between high-service and low-price outlets, most [resale price maintenance arrangements] are probably innocuous"); Frank H. Easterbrook, Vertical Arrangements and the Rule of Reason, 53 Antitrust L.J. 135, 162 (1984) (stating that "every one of the potentially-anticompetitive outcomes of vertical arrangements depends on the uniformity of the practice")).

Furthermore, although the parties have not submitted in connection with this motion for reconsideration any additional evidence regarding the procompetitive and anticompetitive effects of the Wisconsin minimum markup statute, the evidence that was submitted previously in connection with the motion for summary judgment would support a finding that the statute is inconsistent with the Sherman Act under the rule of reason. To be sure, the plaintiff submitted an article describing a 2004 study at the University of Wisconsin–Whitewater which concludes that states with "sales below costs" laws average lower gas prices. (PPFOF ¶ 5; Ex. E.). However, that article only summarizes the study; it does not provide any conclusions relating to the Wisconsin minimum markup law in particular. The authors concede that the study "contradicts the traditional economic view." Furthermore, as noted by the Supreme Court in *Leegin*, price surveys "'do not necessarily tell us anything conclusive about the welfare effects of [resale price maintenance] because the results are generally consistent with both procompetitive and anticompetitive theories.'" 127 S.Ct. at 2718 (quoting T. Overstreet, Resale Price Maintenance: Economic Theories and Empirical Evidence 106 (1983)).

In contrast, the defendant submitted a detailed report from The Federal Trade Commission which specifically criticized the Wisconsin minimum markup law in 2003. (DPFOF ¶ 18; Ex. C, Federal Trade Commission, Re: Wisconsin's Unfair Sales Act, October 15, 2003, available at http://www.ftc.gov/be/v030015.shtm.). In this report, the FTC concluded that Wisconsin's minimum markup law likely restricts competition and leads to higher prices for consumers. The FTC cited factors specific to the Wisconsin law which led to its conclusion that the statute restricted competition, including the civil damages imposed on vendors who cut costs, the inclusion of the minimum markup percentage in the definition of "cost," the use of one of the steepest minimum markup percentages in the country,[1] and the use of "average terminal price" rather

1. The FTC noted that the 9.18% markup appeared to be "completely arbitrary," and that the highest markup percentage for retail fuel sales is typically 6%. The 9.18% markup exceeded that percentage by 50%.

than actual costs. The FTC found that, unlike federal antitrust laws, the Wisconsin minimum markup law protected competitors rather than competition, and contained provisions that directly contravened established antitrust doctrine, as well as basic economic principles and virtually all prominent antitrust scholars.[2] Although the FTC found that all minimum markup laws likely deter pro-competitive pricing, the Wisconsin law "exacerbated these problems."[3]

Moreover, although vertical price restraints are to be judged according to the rule of reason, the Supreme Court in *Leegin* made clear that "[a] horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful." 127 S.Ct. at 2717 (see also *Texaco Inc. v. Dagher*, 547 U.S. 1, 5, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006) ("Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful.")). "To the extent a vertical agreement setting minimum resale prices is entered upon to facilitate either type of cartel, it, too, would need to be held unlawful under the rule of reason." *Id.*

Given that "cost" under the Wisconsin minimum markup law is defined as the "average posted terminal price at the terminal located closest to the retailer," competing retailers in a certain geographical area would be required to charge the same minimum price. As such, the Wisconsin statute involves both horizontal and vertical price fixing. *See 324 Liquor Corp. v. Duffy*, 479 U.S. 335, 342, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987) (noting that "wholesalers in *Midcal* were required to adhere to a single fair trade contract or price schedule for each geographical area," and that "*Midcal* therefore involved horizontal as well as vertical price fixing."). In other words, to the extent that the provisions of the Wisconsin statute create vertical price restraints, they also facilitate the creation of horizontal price fixing. Such being the case, in this court's view the statute is inconsistent with § 1 of the Sherman Act under both the rule of reason and the *per se* rule.

In sum, the Wisconsin minimum markup statute is inconsistent with § 1 of the Sherman Act, even under the rule of reason. Wisconsin's minimum markup statute fixes resale prices industrywide, and is virtually certain to reduce interbrand competition. This finding is consistent with studies that have specifically analyzed the anticompetitive effects of Wisconsin's stat-

2. The FTC cited a study which found that the increase in penalties in the 1998 revision of the Wisconsin minimum markup law increased the average markup by 2 to 3 cents per gallon. *See* J. Brannon and F. Kelly, Pumping Up Gas Prices in Wisconsin: The Effects of the Unfair Sales Act on Retail Gas Prices in Wisconsin, 12 Wisconsin Policy Research Inst. Rep. No. 7 (1999). The FTC noted that this study was consistent with "the growing body of empirical research from the past two decades," which find that minimum markup laws either raise gas prices or leave them unchanged. The FTC specifically criticized the University of Wisconsin-Whitewater

study (which was in draft form) that was cited by the plaintiff.

3. Although the FTC noted the anticompetitive effects of minimum markup laws, which were exacerbated by the provisions of the Wisconsin law, it did not conclude that all vertical price restraints were anticompetitive. Indeed, the Supreme Court in *Leegin* noted that "both the Department of Justice and the Federal Trade Commission-the antitrust enforcement agencies with the ability to assess the long-term impacts of resale price maintenance-have recommended that this Court replace the *per se* rule with the traditional rule of reason." 127 S.Ct. at 2721.

ute. Furthermore, the Wisconsin minimum markup statute involves horizontal price fixing, a *per se* violation of the Sherman Act. In light of such determination, the plaintiff's motion to alter judgment and for reconsideration will be denied.

Finally, as previously stated, on October 31, 2007, the defendant filed a motion to dismiss its counterclaim pursuant to Fed. R.Civ.P. 41. In its motion, the defendant asserts:

> Pursuant to Rule 41 Fed.R.Civ.P. and in conjunction with this Court's Order Granting Summary Judgment on the Plaintiff's claims because of the unconstitutionality of the Wisconsin Markup Statute, Defendant, Flying J Inc., moves the Court to dismiss, *without prejudice,* its Counterclaim, which is based on the same unconstitutional Wisconsin Minimum Markup Statute.

The plaintiff has not filed any response or objection to the defendant's motion. The defendant's motion will therefore be granted.

**NOW THEREFORE IT IS ORDERED** that the plaintiff's motion to alter judgment and for reconsideration be and hereby is **DENIED;**

**IT IS FURTHER ORDERED** that the defendant's motion to dismiss its counterclaim be and hereby is **GRANTED;**

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED.**

**SO ORDERED.**